STATE OF CONNECTICUT *v.* HUGH B. KENYON

MALTBIE, C. J., JENNINGS, ELLS, DICKENSON and O'SULLIVAN, JS.

44

Argued June 17—decided July 9, 1947

*David Goldstein* and *Allyn L. Brown, Jr.,* for the appellant (defendant).

*Arthur M. Brown,* state's attorney, for the appellee (state).

Ells, J.   The defendant was tried before a court consisting of three judges of the Superior Court on an indictment charging murder in the first degree. He was convicted of murder in the second degree and has appealed to this court.   The sole defense was that he was insane at the time he committed the homicide.   The only assignment of error is that the court erred in adjudging the defendant guilty beyond a reasonable doubt.   The specific claim is that, as the state offered no medical evidence that the defendant was sane, it could not be found proven beyond reasonable doubt that he was sane, in view of expert evidence offered by him that he was insane.

The defendant was indicted by a grand jury in September, 1940, for murder in the first degree for the killing of Rita Wheaton in Groton on July 17, 1940. His mother filed a written motion in which she represented that the defendant was insane or so mentally defective that he was unable to understand the proceedings against him; the provisions outlined in General Statutes, Cum. Sup. 1935, § 1722c, were followed; and on November 8, 1940, the physicians filed their report. On the same day a hearing was held by the court, the defendant was in effect found to be then unable to understand the proceedings because he was insane or mentally defective, and it was ordered that he be committed to the Norwich State Hospital for the Insane for confinement, support and treatment until the time of his trial. A mittimus was issued accordingly. On June 18, 1946, the superintendent of the hospital filed in court a written report stating that the defendant was then neither insane nor so mentally incapable as to be unable to understand the nature of the proceedings against him. On June 20, 1946, the court ordered that he be discharged from the state hospital and remanded to the custody of the sheriff of the county, without bail, for confinement in jail until the time of his trial. On September 16, the defendant was presented before the Superior Court and pleaded not guilty to the indictment for murder in the first degree and elected trial by the court.

Upon the trial of the case, the state, though calling no medical experts, offered the evidence of witnesses as to the conduct and behavior of the defendant before and immediately after the commission of the crime. Significant evidence as to his mental condition at the time he killed his victim, as well as before

and after, was afforded by the defendant himself in a voluntary statement made to the coroner a few hours after the killing. In it the defendant described how he struck the deceased several times with a blackjack, and he said that when she asked him to stop he "couldn't turn back," he "was scared." Later, when she asked him to take her home or to a hospital, he said, "Rita, I can't, your face is awful, I wouldn't dare," and, "It's too late, Rita, I can't now, because they would put me in prison." He also asked her "if she forgave" him. He stated that, after she had died and he had placed her body in a nearby brook, he knelt down and asked God to forgive him, and "if there was any chance of meeting on the other side that I could ask her to forgive me." From all this evidence the court could reasonably decide that the defendant at the time of the commission of the homicide had mind and capacity, reason and understanding enough to enable him to judge of the nature, character and consequences of the act charged against him, that the act was wrong and criminal, and that the commission of it would properly and justly expose him to penalties. This is the legal test of responsibility in this state. *State* v. *Johnson*, 40 Conn. 136, 139; *State* v. *Saxon*, 87 Conn. 5, 11, 86 A. 590.

The defendant offered no evidence other than the testimony of four physicians skilled in the diagnosis and treatment of mental diseases, and the hospital records pertaining to him, covering the time he was confined at the Norwich State Hospital. Three of the witnesses had been on the staff of the hospital all or a part of that period. They diagnosed his condition as schizophrenia. The remaining witness was not connected with the hospital while the defendant

was there, and he would not go so far as to diagnose the condition as schizophrenia. He saw the defendant only when he examined him with a view to his commitment before trial, and at that time he gave an opinion that "the prisoner is a psychopathic personality with definite mental symptoms." When the experts were asked to give their opinion as to the condition of the defendant at the time he committed the homicide, and particularly to apply the legal test of responsibility hereinbefore stated, two of them testified that in their opinion the defendant did not have sufficient mental capacity at the time of the crime to know the nature and quality of his act and that he did not have sufficient capacity to distinguish right from wrong. One of the two admitted, however, that a person might have schizophrenia and still be able to distinguish between right and wrong. Another doctor testified that the defendant's mental condition was such that "his ability to make a good critical judgment which would include in some instances capacity to differentiate between right and wrong was very much distorted." It was his opinion that "the act and its various peculiarities indicated a distorted motivation, which disturbed [the defendant's] ability to distinguish right from wrong, or to appreciate fully the consequences of the act." When asked directly whether the defendant could tell the nature of his act in view of his mental condition, he answered: "I rather think he could"; and he also admitted that the defendant might be suffering from the disease and still tell right from wrong. The opinion of the remaining doctor was that the defendant was not capable of distinguishing between right and wrong and that "he didn't know the nature of his acts, that is the full nature, the nature of his acts."

Upon the conclusion of this testimony the defendant rested. The state offered no evidence in rebuttal.

Some of the reasons why the court did not accept the opinions of the experts are apparent from the evidence we have related. A principal one is that it does not appear that any of the doctors had before them the statement which the defendant made to the coroner, or similar details of the crime. The court could reasonably conclude that their opinions were greatly weakened by that fact.

There is much discussion in the briefs of counsel concerning the claim that the state relied solely upon the presumption of sanity and that it was overcome by the introduction of expert evidence of insanity on the part of the defendant. We have already pointed out the fallacy in this contention. The next claim is that "even though the State's lay evidence were considered to bear on the question of the sanity of the accused, expert evidence is required to sustain a conviction where the defense of insanity has been raised." A single sentence has been taken from *State* v. *Wade,* 96 Conn. 238, 248, 113 A. 458, where, in discussing a ruling upon evidence offered by a physician, we said: "Medical expert evidence is indispensable as an aid in the administration of justice." This is far from saying that it shall be conclusive. The sentence immediately following the quoted one is: "The tendency in its use is to spin its theories too fine and too far away from the real issue." However that may be, we point out that the decision in the *Wade* case, where much expert testimony was offered, makes it plain that the entire evidence is to be considered by the trier. We stated this rule in *State* v. *Joseph,* 96 Conn. 637, 639, 115 A. 85, where we approved the following charge:

"Now, having heard all the evidence, it is for you, taking it all into careful account, to say whether the legal sanity of this man has been established beyond a reasonable doubt, bearing in mind that, the issue having been raised, the burden rests upon the State, as it does in all other particulars in this case, to satisfy you beyond a reasonable doubt that this man was legally sane and responsible at the time these offenses were committed. That simply means that, taking all the evidence together,—offered by both sides in this case,—you are to decide whether the burden which the State carries has been met; and it has been met if, upon all that evidence, you are satisfied beyond a reasonable doubt that the man was sane and responsible." In *State* v. *Saxon,* supra, 18, we said: "The weight which is to be given to the opinion evidence of expert witnesses, as is the case with other witnesses, is for the jury. Unless the facts assumed as the basis of such testimony are true, the evidence is of little weight." The case of *People* v. *Plyler,* 126 Cal. 379, 382, 58 P. 904, presented an essentially similar situation to the one before us. The court said: "Even conceding that the expert evidence and the opinion evidence of friends and acquaintances all pointed to defendant's insanity, still the jurors had the right, and it was their duty, to measure and weigh that evidence in conjunction with defendant's conduct and acts as that conduct and those acts were disclosed by all the circumstances of the case; and, after so weighing all the evidence, it was their duty to say whether or not the insanity of the defendant was shown. . . ."

There may or may not come a time when by legislative enactment the question of responsibility for crime, as it relates to alleged insanity, will be de-

termined by a state board of psychiatrists. Until then we must proceed in accordance with our law, follow the tests it has formulated and leave the question whether the state has proved that the accused is mentally responsible for the crime he has committed to the trier to decide, in the light of all the evidence, including that of experts.

A review of the evidence, particularly the statements which the defendant made to the coroner, shows that the court could have found beyond a reasonable doubt that the defendant possessed, at the commission of the homicide, mind enough to be the subject of punishment.

In *State* v. *Wade,* supra, 244, we said in substance that the facts and details of a homicide which make it particularly atrocious and shocking are to be taken into consideration in connection with a claim of mental deficiency of the accused and his manner and conduct during the prior period of his life, as shown by the evidence, in determining whether at the time of the act he had sufficient mind to understand the nature and consequences thereof. In the present case the crime was indeed atrocious and shocking. It is not necessary to relate the revolting details more than we have done. Four considerations, present in this case, which seemed well-nigh conclusive to the experts are not so as a matter of law. They are stated in the following quotation: "Insanity is not, however, proved by evidence that the slayer entertained no known ill will, or by the enormity of the crime, or by the barbarous manner in which it was committed, or by the fact that there was no apparent provocation." Singer & Krohn, Insanity & Law, p. 292; *Thomas* v. *Commonwealth,* 196 Ky. 539, 549, 245 S.W. 164.

It must be conceded that had the court adopted the testimony of the defendant's experts it could not legally have found him guilty of murder in the second degree. However, it was entitled to disregard their opinions and adopt the testimony offered by the state. One duty, among others, was to consider the details of the homicide, "not only in determining its degree, but in determining the mental responsibility of the accused at the time of the commission of the homicide." *State* v. *Wade,* supra, 245. The circumstances of the killing indicated a warped mentality, but the defendant's statement to the coroner furnished evidence from which the court reasonably could have found that he had mind enough to be the subject of punishment for his awful crime. It is of some significance that he was not found guilty of first degree murder, as charged. The case was tried by a court consisting of three judges of experience and ability, and it was for them to determine the weight to be given to all the evidence produced upon the trial. Upon all the evidence in the case the court was justified in finding the defendant guilty of murder in the second degree beyond a reasonable doubt.

There is no error.

In this opinion the other judges concurred.