STATE OF CONNECTICUT *v.* JOHN W. EVANS
(12513)

PETERS, C. J., HEALEY, SHEA, DANNEHY and GLASS, Js.

Argued December 3, 1986—decision released April 14, 1987

*Raymond M. Carey,* public defender, for the appellant (defendant).

*Robert J. Enright,* special assistant state's attorney, with whom, on the brief, were *John T. Redway,* state's attorney, and *James G. Clark,* assistant state's attorney, for the appellee (state).

ARTHUR H. HEALEY, J. After a trial to a three judge panel, *Spallone, Lexton* and *L. Dorsey, Js.,* the defendant, John W. Evans, was found guilty of the crime of felony murder in violation of General Statutes §§ 53a-54a and 53a-54c.[1] The court, however, was

---

[1] General Statutes (Rev. to 1979) § 53a-54a which defines murder and concerns affirmative defenses and evidence of mental conditions provides in part: "(a) A person is guilty of murder when, with intent to cause the death of another person, he causes the death of such person or of a third person or causes a suicide by force, duress or deception; except that in any prosecution under this subsection, it shall be an affirmative defense that the defendant acted under the influence of extreme emotional disturbance for which there was a reasonable explanation or excuse, the reasonableness of which is to be determined from the viewpoint of a person in the defendant's situation under the circumstances as the defendant believed them to be, provided nothing contained in this subsection shall constitute a defense to a prosecution for, or preclude a conviction of, manslaughter in the first degree or any other crime.

"(b) Evidence that the defendant suffered from a mental disease, mental defect or other mental abnormality is admissible, in a prosecution under

divided. Two judges, *Spallone* and *Lexton, Js.,* found the defendant guilty of felony murder.[2] One judge, *L. Dorsey, J.,* found the defendant not guilty by reason of insanity. General Statutes § 53a-13.[3] This appeal followed.[4]

---

subsection (a), on the question of whether the defendant acted with intent to cause the death of another person."

General Statutes § 53a-54c which defines felony murder provides in part: "A person is guilty of murder when, acting either alone or with one or more persons, he commits or attempts to commit robbery, burglary, kidnapping, sexual assault in the first degree, sexual assault in the first degree with a firearm, sexual assault in the third degree, sexual assault in the third degree with a firearm, escape in the first degree, or escape in the second degree and, in the course of and in furtherance of such crime or of flight therefrom, he, or another participant, if any, causes the death of a person other than one of the participants, except that in any prosecution under this section, in which the defendant was not the only participant in the underlying crime, it shall be an affirmative defense that the defendant: (A) Did not commit the homicidal act or in any way solicit, request, command, importune, cause or aid the commission thereof; and (B) was not armed with a deadly weapon, or any dangerous instrument; and (C) had no reasonable ground to believe that any other participant was armed with such a weapon or instrument; and (D) had no reasonable ground to believe that any other participant intended to engage in conduct likely to result in death or serious physical injury."

[2] The judges composing the majority filed a written memorandum of decision setting out their findings and conclusions and the dissenting judge also filed such a memorandum.

[3] General Statutes (Rev. 1981) § 53a-13 entitled "INSANITY AS DEFENSE" provides: "In any prosecution for an offense, it shall be a defense that the defendant, at the time of the proscribed conduct, as a result of mental disease or defect lacked substantial capacity either to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law. It shall not be a defense under this section if such mental disease or defect was proximately caused by the voluntary ingestion, inhalation or injection of intoxicating liquor or any drug or substance, or any combination thereof, unless such drug was prescribed for the defendant by a licensed practitioner, as defined in section 20-184a, and was used in accordance with the directions of such prescription. As used in this section, the terms mental disease or defect do not include an abnormality manifested only by repeated criminal or otherwise antisocial conduct."

[4] The defendant was also found guilty under the second count of the crime of larceny in the second degree in violation of General Statutes § 53a-123. The defendant's brief on this appeal abandons the appeal as to the larceny count.

On appeal, the defendant claims that the trial court erred in denying his motion to suppress statements made by him in violation of his rights to remain silent and to the assistance of counsel under the fifth, sixth and fourteenth amendments to the United States constitution and article first, § 8, of the Connecticut constitution. He also claims that the majority of the three judge panel erred in failing to find him not guilty of felony murder by reason of insanity as defined in General Statutes § 53a-13.

The underlying facts are as follows:[5] On December 1, 1980, the defendant burglarized and stole various items

---

[5] The majority opinion made the following findings of fact and conclusions:

"MEMORANDUM OF DECISION

"The undersigned majority of a three-judge panel makes the following finding of facts in the above captioned case:

"1. On December 1, 1980 the defendant committed a burglary at the summer residence of Elizabeth Lundblad on Bay Road, East Hampton, Connecticut by forceably and unlawfully entering said residence with the intent to commit a larceny therein and the defendant did on said date unlawfully take possession of various and sundry items from within said residence and carried them away with him.

"2. Also on said date the defendant committed a burglary at the summer residence of Paul Cella on Bay Road, East Hampton, Connecticut by forceably and unlawfully entering said residence with the intent to commit a larceny therein and the defendant did on said date unlawfully take possession of various and sundry items from within said residence and carried them away with him.

"3. Thereafter, on said date the defendant committed a burglary at the home of Janet Maitland on Bay Road, East Hampton, Connecticut, by forceably and unlawfully entering said residence with the intent to commit a larceny therein, including the unlawful taking of the keys to a motor vehicle owned by said Maitland, and the defendant [did] on said date unlawfully take possession of various and sundry items from within said residence including the keys to the Maitland motor vehicle and carried them away with him and did unlawfully take possession of the Maitland motor vehicle and after loading the vehicle with the unlawfully obtained items from the Lundblad, Cella, and Maitland residences he drove the motor vehicle away.

"4. The Lundblad and Cella residences were unoccupied at the time of said burglaries.

"5. The Maitland residence was occupied by Janet Maitland at the time

from two summer residences on Bay Road in East Hampton. These residences were unoccupied at the time. On the same date, the defendant also burglarized the home of the victim. The victim, who had been home at the time of the burglary, was killed by the defendant during the course of that crime. The defendant stole the victim's motor vehicle, storing the articles he had taken during the three burglaries in the trunk. The defendant then drove to Michigan.

On December 4, 1980, Officer Gaylord Schurr of the Kent County sheriff's department in Grand Rapids, Michigan, was alerted to be on the lookout for a Connecticut registered motor vehicle which had been

that the defendant broke into the home, and in the course of said burglarizing, the defendant killed Janet Maitland.

"6. The sundry articles taken from the three homes burglarized were found in the Maitland motor vehicle which the defendant drove to the state of Michigan.

"7. The defendant was involuntarily apprehended in Michigan when he committed a motor vehicle violation in said State.

"8. The defendant voluntarily gave a full statement of his criminal activities in Connecticut to the Michigan Police and the Connecticut State Police, independently and on two separate days.

"9. The defendant's two versions of what occurred in Connecticut relevant to the aforesaid criminal activity are substantially and materially consistent with each other.

"10. The defendant's two versions of what had occurred are not substantially and materially consistent with that given to the two psychiatrists who examined him five and eleven months later, respectively and especially as to his intent and motivation.

"11. The defendant understood and appreciated that it was wrong and against the law to commit burglary and larceny, and he was not driven by an inner 'compulsion' to perpetrate said crimes.

"12. The defendant was capable of forming an intent to commit burglary and larceny free of any compulsion to do so by reason of a mental disease.

"The majority of the three-judge panel makes the following conclusions:

"13. The defendant engaged in a burglary spree on December 1, 1980, burglarizing three residences, the last of which was the home of Janet Maitland.

"14. The defendant broke into the Maitland home with the intent and for the purpose of burglarizing it.

involved in a hit-and-run accident. Additionally, he was told that the vehicle had been reported stolen and had belonged to the victim of a homicide. Schurr observed the vehicle and, with the help of other officers, apprehended the defendant.

While in custody for the felonious possession of a stolen motor vehicle and after having been advised of his *Miranda* rights, the defendant, on December 4, 1980, gave a tape recorded statement to the Michigan police, fully describing the burglaries and the homicide in Connecticut. Subsequently, on December 5, 1980, the defendant, while still held in Michigan, gave a second incriminating statement, this time to the Connecticut state police.

"15. The defendant did kill Janet Maitland while in the course of committing a felony.

"16. The defendant is guilty of a felony murder, in violation of Section 53a-54c of the Connecticut General Statutes.

THE COURT
/s/ Spallone, J.
/s/ Lexton, J."

The dissenting opinion made the following findings of fact and conclusions:

"MEMORANDUM OF DECISION

"The undersigned minority of a three-judge panel makes the following finding of facts in the above captioned case:

"1. On December 1, 1980 the defendant entered the home of Janet Maitland on Bay Road, East Hampton, Connecticut.

"2. The defendant knew the Maitland residence was occupied by Janet Maitland alone at the time that the defendant broke into the home.

"3. The defendant entered the dwelling for the purpose of causing the death of Janet Maitland and in the course of entering and remaining in the dwelling the defendant killed Janet Maitland.

"4. The defendant, at the time of entering and remaining in the dwelling and at the time he killed Janet Maitland was compelled to act as a result of a mental disease from which he suffered and he lacked substantial capacity either to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law.

"5. The defendant is Not Guilty by reason of insanity ([General Statutes § ] 53a-13) on all counts.

The Court,
/s/ Leonard Dorsey, J."

The majority opinion found that the two statements as to what had occurred in Connecticut were "substantially and materially consistent with each other." It also found that the two versions of what had occurred, however, were "not substantially and materially consistent" with that given to the two psychiatrists, Walter A. Borden and Colin C.J. Angliker, both of whom testified for the defendant at the trial. Additionally, the majority opinion found that the defendant "understood and appreciated that it was wrong and against the law to commit burglary and larceny, and [that the defendant] was not driven by any inner 'compulsion' to perpetrate said crimes." The majority concluded that the defendant had been capable of forming an intent to commit burglary and larceny and was "free of any compulsion to do so by reason of a mental disease."

## I

We address first the defendant's claim that the trial court erred in denying his motion to suppress his statements in violation of his constitutional rights to remain silent and to the assistance of counsel under the fifth, sixth and fourteenth amendments to the United States constitution and article first, § 8, of the Connecticut constitution.[6]

---

[6] Although we recognize that the *Miranda* warnings; *Miranda* v. *Arizona*, 384 U.S. 436, 463–65, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966); have come to have an independent significance under our state constitution; Conn. Const., art. 1, § 8; *State* v. *Falby*, 187 Conn. 6, 11 n.1, 444 A.2d 213 (1982); see *State* v. *Chung*, 202 Conn. 39, 45 n.7, 519 A.2d 1175 (1987); we need not address the defendant's claim under our state constitution. As we have reiterated most recently in *State* v. *Chung*, supra: " 'The defendant, however, "has proffered no argument that the rights afforded to him by the federal and state constitutions are in any way distinguishable with respect to the substantive issue that he has raised. We see no reason, on the facts of this case, independently to undertake such an analysis." *State* v. *Braxton*, 196 Conn. 685, 688 n.2, 495 A.2d 273 (1985).' *State* v. *Toste*, 198 Conn. 573, 576 n.3, 504 A.2d 1036 (1986)."

Additionally, we need not address the defendant's conclusory claim under the sixth amendment. The United States Supreme Court has held that the

The defendant claims that his statements, given to the Michigan police on December 4, 1980, and to the Connecticut state trooper on December 5, 1980, were erroneously admitted into evidence because both were made without a valid voluntary, knowing and intelligent waiver of his constitutional rights. In addition to the claim of a lack of a valid waiver, he claims that the statement of December 5, 1980, was "tainted" by the constitutional violations of the December 4, 1980 statement. The invalidity of the second statement, he argues, goes beyond the "letting the cat out of the bag" rationale. See *United States* v. *Bayer,* 331 U.S. 532, 67 S. Ct. 1394, 91 L. Ed. 1654 (1947).

The state maintains that the trial court properly admitted into evidence the defendant's incriminating statements. The state essentially argues that after the defendant first informed the police of his desire for a lawyer, interrogation ceased and that it was only after the defendant had initiated discussion with the police and validly waived the constitutional rights that he had previously invoked, that he made the inculpatory statement of December 4, 1980. According to the state, the December 5, 1980 statement was made after an explicit and valid waiver of his rights and there was no "taint" from the earlier statement. The state maintains, therefore, that both statements were obtained after the

sixth amendment right to counsel does not attach until the "initiation of adversary judicial proceedings—whether by way of formal charge, preliminary hearing, indictment, information, or arraignment." *Kirby* v. *Illinois,* 406 U.S. 682, 689, 92 S. Ct. 1877, 32 L. Ed. 2d 411 (1972); see also *State* v. *Shifflett,* 199 Conn. 718, 726 n.1, 508 A.2d 748 (1986); *State* v. *Ferrell,* 191 Conn. 37, 44 n.10, 463 A.2d 573 (1983); *State* v. *Ledbetter,* 185 Conn. 607, 609, 441 A.2d 595 (1981). At the time of the defendant's interrogation by both the Michigan police on December 4, 1980, and the Connecticut state police on December 5, 1980, adversary judicial proceedings had not yet been commenced and, therefore, the defendant's sixth amendment right to counsel had not yet attached.

defendant's constitutional rights had been fully respected. We agree with the state.

Certain background circumstances will be helpful in the discussion of this issue. Immediately after leaving the victim's home, the defendant loaded the items taken in the three burglaries into the victim's car and drove to Michigan.[7] At approximately 10:50 a.m. on December 4, 1980, Schurr was alerted on his police car radio to be on the lookout for a dark blue Plymouth car with Connecticut license plate 3121 that had been involved in a hit-and-run accident at a shopping mall in North Kent. Schurr sighted the Connecticut car at approximately 11:47 a.m., radioed for assistance, and, with the help of additional police, apprehended the defendant. About ten to fifteen minutes after Schurr had initially observed the car, he handcuffed the defendant and they proceeded to the Kent County sheriff's department in Grand Rapids.

At 1:09 p.m., Detective Sergeant Larry French of the Kent County sheriff's department first saw the defendant in an interview room at the sheriff's department in Grand Rapids. Present with him was Detective Sergeant Clara Kidder. French removed the handcuffs from the defendant, who at the time was quietly sitting in a chair. Immediately after he removed the handcuffs, French asked the defendant "if he had any idea why he was at the police department?" The defendant replied, stating that "no, he didn't care." After French remarked that the defendant must be curious as to why the police were holding him, the defendant said, "Well, I don't care to know." French informed the defendant of why he had been apprehended, introduced Kidder and advised the defendant of his constitutional rights.

---

[7] There was evidence at the trial that the defendant had been born in Detroit, Michigan, and that his grandfather had lived in Grand Rapids, Michigan.

Prior to interviewing the defendant, French had spoken to a lieutenant of the Connecticut state police department. During this discussion, which occurred at approximately 12:40 p.m., French advised the Connecticut police "essentially" that they had a person in custody who had been driving a vehicle wanted by Connecticut as stolen and that that person had no identification on him. French also informed the Connecticut police that this person fit the description of a person who earlier that day had been involved in an accident in Kent County. The Connecticut lieutenant told French at that time that the vehicle was believed to have been taken from a residence in Connecticut where a woman had been found dead in her home, that "they had [as a suspect] an individual [named] John Evans" who lived within one mile of the victim, that Evans had been missing since December 1, 1980, and that Evans' whereabouts were then unknown. At that time, French did not know that the person they then admittedly had in custody for the Michigan felony of possession of a stolen motor vehicle was actually John Evans. He was not in custody for any other reason at that point.

When French gave the defendant his *Miranda* warnings, he advised the defendant that if he decided to answer questions, he could stop at any time and request an attorney and that an attorney would be appointed for him if he could not afford one. Although the defendant refused to sign the rights form proffered by French, he did indicate that he understood his rights and that he did not have any question as to what his rights were. He then stated that he wanted an attorney. Although the Michigan police did not contact an attorney at that time, French informed the defendant that "we would see that he got an attorney."

At that time, Kidder told the defendant that there was "an identification form" that had to be filled out as he was to be locked up in jail. The information sought

included such things as his name, address, date of birth, height, weight, color of eyes, driver's license number, social security number and nearest relative. The defendant, although nervous, appeared alert and was responsive to the questions, none of which had anything to do with why he was arrested. The information was obtained by use of a form which is customarily used by the county sheriff's department for booking purposes in all cases of this kind. Kidder left the interview at approximately 1:30 p.m. in order to obtain a search warrant for examination of the defendant's bodily substances and clothes.[8]

After Kidder left, French returned to the interview room and proceeded with the paper work involved in processing the defendant for booking. As French did this, he noticed that the defendant began crying and mumbled several times. A number of times French asked, "Did you say something?" The defendant responded by telling French that "it was none of his business." Again, when the defendant mumbled under his breath, French asked, "Are you talking to me?" The defendant answered, "You are not going to understand it anyway." This pattern of conversation continued for about one and one-half hours. During this time, French noticed that Evans' face was red, that he was "sniffing" a lot and that he had smoked five or six cigarettes which had been given to him by French.

At the end of this time, the defendant told French that he had "better get a lot of paper and some tapes." French sent for Schurr and when he arrived told Schurr that the defendant wanted "to talk to us" and that he was requesting that paper and "tape recording tapes"

---

[8] French testified that the police wanted the warrant in order to get hair samples, fingernail scrapings, a small amount of his blood and his clothes. This search and seizure warrant was executed at approximately 6:09 p.m. on December 4, 1980, when the defendant had been taken to the nurse's station. His clothing was also taken at that time.

be brought into the interview room. French arranged to have a tape placed in a recording machine. French again informed him of his constitutional rights, reminding the defendant of his prior request to have an attorney present during questioning. The defendant then waived his constitutional rights and French began to interrogate him. Approximately ten or fifteen minutes later,[9] French noticed that the tape recorder had not recorded any of their discussion. French then told the defendant that they would have to start over again, to which the defendant responded, "Do we have to go through this whole thing again?" Thereafter, the defendant gave an inculpatory statement.

At trial, when the state introduced the tape recording into evidence, the defendant objected, claiming that the statement had been taken in violation of his constitutional rights. After the voir dire examination on the admission of the confession to the Michigan police, the three judge panel ruled that the recorded statement was admissible. In doing so, it found that "the rights of counsel were knowingly and voluntarily waived based on the totality of the circumstances as testified to by [French]."

Settled principles of law control the role of police during custodial interrogations. See, e.g., *Moran* v. *Burbine*, 475 U.S. 412, 106 S. Ct. 1135, 89 L. Ed. 2d 410 (1986); *Smith* v. *Illinois*, 469 U.S. 91, 105 S. Ct. 490, 83 L. Ed. 2d 488 (1984); *Edwards* v. *Arizona*, 451 U.S. 477, 101 S. Ct. 1880, 68 L. Ed. 2d 378, reh. denied, 452 U.S. 973, 101 S. Ct. 3128, 69 L. Ed. 2d 984 (1981); *Rhode Island* v. *Innis*, 446 U.S. 291, 100 S. Ct. 1682,

[9] The majority of this time had been spent informing the defendant of his constitutional rights. At this point, the defendant had not told the officers any details of the Connecticut offenses, although he had told them that the previous Monday he had had an argument with his mother over getting a job and that instead of going out that day to look for a job he went out and remained in the woods.

64 L. Ed. 2d 297 (1980); *North Carolina* v. *Butler,* 441 U.S. 369, 99 S. Ct. 1755, 60 L. Ed. 2d 286 (1979); *Miranda* v. *Arizona,* 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966); *State* v. *Smith,* 200 Conn. 465, 512 A.2d 189 (1986); *State* v. *Derrico,* 181 Conn. 151, 434 A.2d 356, cert. denied, 449 U.S. 1064, 101 S. Ct. 789, 66 L. Ed. 2d 607 (1980). If a suspect indicates that he wishes to remain silent, "the interrogation must cease" and if he requests counsel, "the interrogation must cease until an attorney is present." *Miranda* v. *Arizona,* supra, 474; *Edwards* v. *Arizona,* supra, 482. *Miranda* also holds that "[t]he defendant may waive effectuation" of the rights conveyed in the warnings, "provided the waiver is made voluntarily, knowingly and intelligently." *Miranda* v. *Arizona,* supra, 444; see *Johnson* v. *Zerbst,* 304 U.S. 458, 464, 58 S. Ct. 1019, 82 L. Ed. 1461 (1938). Once a suspect has invoked his right to counsel, he is not subject to further interrogation until counsel has been made available to him "unless the accused himself initiates further communication, exchanges, or conversations with the police"; *Edwards* v. *Arizona,* supra, 484–85; *and* he has knowingly and intelligently waived the right to counsel which he has previously invoked. *Connecticut* v. *Barrett,* 479 U.S. 523, 107 S. Ct. 828, 93 L. Ed. 2d 920 (1987); *Smith* v. *Illinois,* supra. Waiver of *Miranda* rights must, of course, be voluntary. *Moran* v. *Burbine,* supra, 421. "Only if the 'totality of the circumstances surrounding the interrogation' reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived." Id.

There is no real debate but that the defendant, while in custody, invoked his right to counsel at approximately 1:09 p.m. on December 4, 1980. The issues which must be addressed, however, are: (1) whether the questions posed by the "identification form," to

which the defendant responded, violated his *Miranda* rights; and (2) whether, after invoking his right to an attorney, *he* "initiated" discussions with the police and validly waived his earlier-invoked constitutional right to counsel. The three judge panel ruled that he did and we agree.

Our first inquiry is whether the questioning of the defendant after he had been informed of his *Miranda* rights and had requested the opportunity to speak with an attorney violated the defendant's constitutional rights. At the outset, we recognize that after a suspect has invoked his right to speak with an attorney, *Miranda* does not prohibit *all* communication between the suspect and law enforcement officers. Instead, *Miranda* and its progeny proscribe continued *interrogation* of the suspect. The issue that must be resolved, therefore, is whether the questioning concerning the "identification form" that concededly took place between 1:09 p.m., when the defendant invoked his right to speak with an attorney, and the time when the defendant subsequently waived that right, amounted to "interrogation" of the defendant.

In *Rhode Island* v. *Innis,* supra, the United States Supreme Court considered what sorts of words or conduct on the part of police constitute "interrogation." That court held that interrogation may be "either express questioning or its functional equivalent"; id., 300–301; and defined the latter to include any statements or actions "that the police should know are reasonably likely to elicit an incriminating response from the suspect." Id., 301. Although the United States Supreme Court's opinion appears to assume that direct questioning of a suspect in custody always constitutes interrogation, courts which have addressed the issue after *Innis* have held that the reasoning which supports *Innis* and the purpose behind *Miranda* itself, compel the conclusion that not every express question posed

in a custodial setting is equivalent to "interrogation." See, e.g., *Robinson* v. *Percy,* 738 F.2d 214, 219 (7th Cir. 1984); *United States* v. *Sims,* 719 F.2d 375, 378 (11th Cir. 1983), cert. denied, 465 U.S. 1034, 104 S. Ct. 1304, 79 L. Ed. 2d 703 (1984); *United States* v. *Avery,* 717 F.2d 1020, 1024–25 (6th Cir. 1983), reh. denied, 466 U.S. 905, 104 S. Ct. 1683, 80 L. Ed. 2d 157 (1984); *United States* v. *Booth,* 669 F.2d 1231, 1237 (9th Cir. 1981). Rather, the test is whether, under all the circumstances involved in a given case, the questions asked are "reasonably likely to elicit an incriminating response from the suspect." *Rhode Island* v. *Innis,* supra; *United States* v. *Booth,* supra.

The test as to whether a particular question is "likely to elicit an incriminating response" is objective; the subjective intent of the police officer is relevant but not conclusive and the relationship of the questions asked to the crime committed is "highly relevant." *United States* v. *Mata-Abundiz,* 717 F.2d 1277, 1280 (9th Cir. 1983), citing *United States* v. *Booth,* supra, 1238.

"Ordinarily, the routine gathering of background, biographical data will not constitute interrogation." *United States* v. *Mata-Abundiz,* supra; *United States* v. *Booth,* supra; see *United States ex rel. Hines* v. *LaVallee,* 521 F.2d 1109, 1113 (2d Cir. 1975), cert. denied, 423 U.S. 1090, 96 S. Ct. 884, 47 L. Ed. 2d 101 (1976); see also W. LaFave & J. Israel, Criminal Procedure § 6.7. We are aware, however, that "[a] person's name, age, address, marital status and similar data, while usually non-incriminatory in character, may in a particular context provide the missing link required to convict." *United States ex rel. Hines* v. *LaVallee,* supra, 1112; see *United States* v. *Mata-Abundiz,* supra. Cognizant of the *Miranda* jurisprudence, "we recognize the potential for abuse by law enforcement officers who might, under the guise of seeking 'objective' or 'neutral' information, deliberately elicit an

incriminating statement from a suspect." *United States* v. *Booth,* supra; *United States* v. *Downing,* 665 F.2d 404, 407 (1st Cir. 1981). A balance must be struck between information legitimately required by law enforcement to facilitate booking,[10] arraignment, bail or permitting relatives of a defendant to confer with him and the protection of a defendant's constitutional rights. See, e.g., *United States* v. *Hinckley,* 672 F.2d 115, 125 (D.C. Cir. 1982); *United States ex rel. Hines* v. *LaVallee,* supra.

Since the determination as to whether a particular question constituted interrogation is essentially factual, we apply the clearly erroneous standard; see *United States* v. *Booth,* supra; and conclude that the three judge panel was not clearly erroneous in finding that the questions asked of the defendant, under the circumstances of this case, did not constitute "interrogation." In this case, the questions which were asked consisted of routine "booking" questions which were part of a standard processing procedure which was essentially administrative in nature and "not likely to elicit an incriminating response." These routine, noninvestigatory questions were unrelated to the crime and were objectively neutral. Additionally, there is nothing in the record to suggest an improper motive on the part of the Michigan police. Although we need not decide the scope of possible questions that may be posed to a suspect as part of a routine booking procedure, we conclude that there was no error in the finding of the three judge panel.

[10] A suspect who refuses to give his name and address may be ordered by a court to furnish information that will facilitate his identification, such as fingerprints, handwriting exemplars, photographs or blood samples. *United States ex rel. Hines* v. *LaVallee,* 521 F.2d 1109, 1113 (2d Cir. 1975), cert. denied, 423 U.S. 1090, 96 S. Ct. 884, 47 L. Ed. 2d 101 (1976), and cases there cited.

Our next inquiry is whether the defendant, having invoked his right to counsel and to remain silent, did *initiate* "further communications, exchanges, or conversations with the police." *Edwards* v. *Arizona,* supra, 485. In the *Edwards* context, the United States Supreme Court eschewed the building of "a superstructure of legal refinements around the word 'initiate.' " *Oregon* v. *Bradshaw,* 462 U.S. 1039, 1045, 103 S. Ct. 2830, 77 L. Ed. 2d 405 (1983). In doing so, it recognized that there are undoubtedly situations where a bare inquiry by either a defendant, such as a request for a glass of water or a request to use a telephone, or by a police officer should not be held to initiate any conversation or dialogue. Id. Such inquiries or statements, "relating to routine incidents of the custodial relationship" will not generally "initiate" a conversation as that word was used in *Edwards. Oregon* v. *Bradshaw,* supra. "[T]hey cannot be fairly said to represent a desire on the part of an accused to open up a more generalized discussion relating directly or indirectly to the investigation." Id.; see *State* v. *James,* 141 Ariz. 141, 144–45, 685 P.2d 1293 (1984).

In our view, the defendant did "initiate" the discussion, resulting in his inculpatory statement, as required by *Edwards* v. *Arizona,* supra, 482. See *Johnson* v. *Zerbst,* supra, 464; *State* v. *Smith,* supra, 480. When the defendant told French that the latter "[had] better get a lot of paper and some tapes," this "was not merely a necessary inquiry arising out of the incidents of the custodial relationship," but could "reasonably have been interpreted by [French] as relating generally to the investigation." *Oregon* v. *Bradshaw,* supra, 1046; *McCree* v. *Housewright,* 689 F.2d 797, 802 (8th Cir. 1982); *State* v. *Brezee,* 66 Hawaii 162, 164–65, 657 P.2d 1044 (1983). The defendant's request to obtain paper and tapes can fairly be characterized as representing "a desire [on the defendant's part] to open up

a more generalized discussion relating directly or indirectly to the investigation." *Oregon* v. *Bradshaw,* supra, 1045. That French understood this to be the case is apparent from the fact that not only did he again advise the defendant of his constitutional rights but also specifically discussed with him his earlier request for an attorney. Under these circumstances, we conclude that the defendant "initiated" discussion with the Michigan police officers and that the principle of *Edwards* was not violated.

We also conclude that the defendant knowingly and voluntarily waived the right to counsel he had previously invoked. The record indicates that once the defendant "initiated" the conversation, French again advised the defendant of his *Miranda* rights. French specifically reminded the defendant of his earlier request for an attorney because, "before going further," French wanted "to make sure in his own mind" that the defendant wanted to revoke his earlier request for an attorney. The defendant's conduct in proceeding to discuss the events in Connecticut clearly indicated that he gave up his right to have an attorney present during the interview. On the voir dire, the panel had before it evidence from French, the sole witness on the voir dire, that while the defendant seemed normal, he was nervous and that he had no reason to believe that the defendant was of very low intelligence. Aside from those occasions on which the defendant was mumbling, French had no difficulty in understanding the defendant. During the time that the defendant was in the presence of French, he did not indicate or manifest that he was injured in any way nor did he give French any reason to believe that he was under the influence of alcohol or drugs. The defendant did not appear to be "ignorant of the process" and in fact had told Kidder that he had been arrested before. Actually, the defendant in the past had waived his rights in writ-

ing when he had given a sworn statement in connection with an April, 1978 charge of burglary and larceny in East Hampton. The defendant was capable of understanding and appeared to understand his constitutional rights throughout his time with French and Schurr. There was a valid waiver of the defendant's constitutional rights.[11] *Colorado* v. *Connelly,* 479 U.S. 157, 163–67, 107 S. Ct. 515, 93 L. Ed. 2d 473 (1986); *Edwards* v. *Arizona,* supra; *Miranda* v. *Arizona,* supra, 475–76. There was no error in admitting into evidence the defendant's inculpatory statement of December 4, 1980.

We turn now to the defendant's claim that his tape recorded inculpatory statement given at approximately 11:40 a.m. on December 5, 1980, to Connecticut state trooper Jonathan Schweitzer had been tainted by the constitutional violations surrounding his statement of the preceding day to the Michigan police. This statement, he claims, not only goes beyond the rationale of "letting the cat out of the bag" but also that the facts surrounding it clearly fail to show a "knowing and intelligent waiver" of his fifth and sixth amendment rights. We do not agree.

From what we have already determined, there is no merit to the defendant's claim that the statement of

---

[11] The record does not indicate that the Michigan police were aware that the defendant had any preexisting mental problems at the time he gave his inculpatory statement to them on December 4, 1980. See generally *Colorado* v. *Connelly,* 479 U.S. 157, 107 S. Ct. 515, 93 L. Ed. 2d 473 (1986).

We note that the defendant remained in the interview room from the time he had invoked his right to counsel at approximately 1:30 p.m. on December 4, 1980, until later that afternoon when he gave his inculpatory statement. French testified on voir dire that the defendant had not been put in jail during that time because the police were in the process of obtaining a search warrant for body substances and he did not want him to be put in jail where he would have access to soap and water. He was not allowed to comb his hair or wash or remove anything from his person until the search warrant had been executed.

December 5, 1980, was constitutionally tainted by the earlier statement; the "cat out of the bag" rationale is inapplicable. In addition, it is of significance that when the statement was given to Schweitzer, about eighteen hours had elapsed since the statement of the preceding day, and also that prior to taking the statement, Schweitzer again advised the defendant of his *Miranda* rights and the defendant explicitly waived those rights. While not controlling, it is relevant that prior to giving the statement to Schweitzer, the defendant had signed the *Miranda* rights form which Schweitzer had read to him. There was no error in admitting the statement of December 5, 1980.

## II

The defendant next claims that the majority of the three judge panel committed reversible error in failing to find him not guilty of felony murder by reason of insanity as defined in General Statutes § 53a-13. The defendant claims that the opinions offered by his expert witnesses, Walter Borden and Colin Angliker, both psychiatrists, constituted "substantial evidence tending to prove insanity," thereby requiring the state to prove his sanity beyond a reasonable doubt.[12] He contends that "considering the detailed and uncontroverted testimony as to [his] long history of severe psychiatric illness right up to the time of the incident and even up to the time of the trial, and the absence of relevant and competent testimony in rebuttal," the state has failed in its burden of proof. He also argues that the majority made "virtually contradictory findings" which in turn were not supported by the evidence.

To analyze this claim properly, certain additional circumstances should be set out in some detail. The state

---

[12] General Statutes § 53a-12 (a) provides: "When a defense other than an affirmative defense, is raised at trial, the state shall have the burden of disproving such a defense beyond a reasonable doubt."

did not produce any expert witnesses to testify in its case-in-chief. It did, however, produce French and Schweitzer, the two police officers who were present when the defendant gave his statements. Their observations, recollections and opinions concerning the conduct and condition of the defendant, as already set out, were developed both on direct and cross-examination.

Dr. Borden, whose qualifications were conceded by the state, was the first expert who testified for the defense. On direct examination, he testified, inter alia, as follows: that he had examined the defendant for approximately one hour on April 21, 1981, at the Hartford Correctional Center and that he had reviewed certain hospital records that had been made available to him concerning the defendant's prior mental history. He stated that he knew of other institutional admissions for which he did not have the records.[13] His review of the records, which "were fairly clear cut," described "severe paranoid schizophrenia with delusions of persecution; delusions of grandeur, auditory hallucinations; severe thought disorder with associated and disorganized thinking." Borden related that the defendant "was found from the record to be impulsive, violent . . . assaultive at times, uncontrolled and unpredictable." He referred to a notation in a January 14, 1980 hospital record which stated, "he plans to commit murder and go undetected and become famous as a fail-

[13] Borden testified that when he made his mental status examination on April 21, 1981, he had reviewed a copy of a report and records from Hartford Hospital where the defendant had been an inpatient from August 8, 1976, through August 19, 1976, and then an outpatient until August 19, 1977. Although he had information that the defendant was later admitted to Norwich Hospital, he said that those records were not available. He had copies of the records of the Connecticut Valley Hospital to which the defendant had been admitted on an emergency certificate on January 3, 1980, and discharged on January 28, 1980. He also testified that, while the defendant had "apparently" also been a patient at the Institute of Living, he did not have those records.

ure." Borden's examination disclosed that the defendant was able to communicate, was still delusional and was able to give a good account of what had happened in Connecticut. It was Borden's opinion that at the time of his examination, the defendant "was severely mentally ill [and] . . . potentially suicidal." Borden related that in the fall of 1980, the defendant believed that he was "a 'Ninja,' a Japanese assassin," that he "felt he had to kill somebody, and [that] he selected his neighbor woman and he knew he had a fairly good relationship with [her] on a realistic basis. He in a sense knew he would kill her sometime before this."[14]

After having Borden look at a copy of the statute on the insanity defense, defense counsel also asked him if he had an opinion. Borden replied, inter alia, that the defendant "did suffer from mental disease, that being schizophrenia paranoid type, and that as a result of that disease, he had a substantial impairment in his capacity, both to appreciate the wrongfulness of his behavior and to conform his conduct to the requirements of the law."

On cross-examination, which was extensive, Borden testified, inter alia, as follows: The defendant was aware that Borden came to the jail to do a psychiatric examination of him. Borden found there were psychotic

---

[14] The defendant told Borden that he went to the victim's house where he "sat and waited for her," that he "had it in his mind he had to go through with it and that he had to commit murder that day. He had her in mind. He had to kill something. He said there was something inside me." The defendant "knew [he] was going to kill her. [He] was waiting like a Ninja; hiding in the dark." Relating that the defendant described smothering the victim, Borden's opinion was that "at that time, [the defendant] was delusional with very poor judgment and certainly not able to conform his conduct to the requirements of the law, nor to really appreciate what his behavior was. In effect, it was a combination of both suicidal and homicidal acts."

The defendant also said to Borden: "I tried to kill myself so many times . . . I couldn't do it; it failed. I knew I was going to kill her."

delusions, fresh signs of psychosis and that the clinical data from Hartford Hospital and Connecticut Valley Hospital "really were consistent with the crime." He testified that from the January, 1980 hospital data, the defendant "couldn't have given a clearer warning, and that was quite consistent with his account as recollected as [to] what happened just preceding the time of the crime." Although there "may be some embellishment [by the defendant]," Borden thought that the evidence indicated that the defendant was giving "a fairly accurate account" of what had occurred. Borden candidly admitted that he was not aware of what the defendant had said at the time of either of the statements to the police, as he did not have those statements available and had not heard them. He did admit, however, that the tape recordings of the statements would have been helpful in getting a more accurate picture of the defendant's feelings at the time of the crime. Although he felt that the defendant was psychotic all during the course of the day of December 1, 1980, it was not his opinion that all his actions on that day were influenced by his psychosis. He conceded that just because a person commits a serious crime and may be seriously ill, it does not necessarily follow that the crime was the result of the mental illness from which he was suffering. He had no opinion whether the defendant was "legally insane" at the time he committed the other two burglaries. Borden could not "elicit" any clear auditory hallucinations in the defendant on December 1, 1980. Borden stated that it would not surprise him if the defendant had not told the police about such things as being compelled to kill because, according to Borden, "I think you have to know what to ask."

The account Borden received from the defendant when he inquired about the specifics of what had happened, was that the defendant did not go to the vic-

tim's house to steal, to burglarize and try to get away, but that "he went in to kill." In his examination, Borden tried to determine "what really was motivating him" and "the major emphasis in the account [Borden] got from [the defendant] was that [the defendant had been] really struggling for a long time with both suicidal and homicidal impulses. The stealing behavior [Borden thought] was relatively recent and a relatively minor issue." Borden also testified that if the defendant had indicated to the police that he had killed the victim to cover up the crime, that in and of itself did not imply a psychosis. Borden opined that the defendant realized that the law prohibited not only his stealing but also his breaking into the victim's home when he did. In addition, Borden testified that the defendant "knew" at the time he had committed the murder that the law prohibited it, but that the defendant could not really appreciate that fact, nor could he conform his conduct to the requirements of law at the time he had committed the crime. The defendant "felt compelled that he had to do [the homicide]," a "real compulsion" that went back one year.

On redirect, Borden stated that the defendant appeared to be of average intelligence although not well educated. Although no person ever gives "a really precise entirely objective account," Borden felt that even if the defendant had tried to embellish it, he was "schizophrenic severely and sick all the ways mentioned and the findings of the examination and the account [the defendant] gave [were] consistent with that."

Dr. Angliker, whose qualifications were also conceded by the state and who had examined the defendant at the state's request, testified for the defense. He had seen the defendant on October 9 and 10, 1981, and had spoken to him in jail for approximately six hours. The state had furnished him certain materials, including a

transcript of the defendant's confession.[15] Angliker did not have any hospital records. Angliker had read Borden's report which referred to several hospitalizations and had no "special disagreement" with anything in that report. As a result of his examination, Angliker concluded that the defendant was suffering from "a long standing mental illness, dating back many years [to] early adolescence." That illness was paranoid schizophrenia, and as part of that illness the defendant suffered from hallucinations and delusions of persecution for many years. These were among the symptoms that the defendant, who was then twenty-four years of age, manifested during Angliker's examination.

Angliker testified that the statement of the defendant in January, 1980, referred to in the Connecticut Valley Hospital record that he would "kill someone," should have served as a warning. Given his view of the length of the defendant's mental illness over the years and what had occurred on December 1, 1980, the "kill someone" notation was consistent with his mental disease. Even after examining the defendant and considering "a long statement" given by the defendant at the sheriff's office in Michigan, Angliker concluded that the defendant was suffering from paranoid schizophrenia on December 1, 1980. The defendant told Angliker about his being a "Ninja" and his lying in wait, but Angliker did not "go into it in too great detail."

Angliker was familiar with the statutory test for insanity. As a result of his examination, it was his opin-

---

[15] Angliker was also given a grand jury synopsis of the case consisting of three pages, the autopsy report, a competency report from a court diagnostic team (consisting of a psychiatrist, a psychologist and a chief psychiatric social worker) dated December 10, 1980, filed pursuant to General Statutes (Rev. to 1979) § 54-40 (b) (now § 54-56d), and a copy of Borden's report. The evidence is not clear whether Angliker was given a transcript of the December 5, 1980 statement made to Connecticut trooper Schweitzer.

ion that, at the time of the homicide, the defendant "was, in fact, suffering from a mental disease and did lack substantial capacity either to appreciate the wrongfulness of his conduct or to [conform] his conduct to the requirements of the law."

The defendant argues that the panel erred in not finding him not guilty by reason of insanity. We disagree. " 'The state has a right, in the first instance, to rely on the presumption that the defendant was sane at the time of the offenses alleged in the indictment, and thereupon it becomes the privilege of the accused to offer such evidence as he desires upon the subject of his mental condition. As soon as *substantial evidence* tending to prove insanity comes into the case, *the presumption loses all operative effect.* The state may then rebut this evidence if it desires or submit the issue to the court upon the evidence offered. In either case, the issue having been raised, the burden rests upon the state, as it does in all other essential elements in the case, to prove beyond a reasonable doubt that the accused was legally sane and responsible at the time the offenses were committed. *State* v. *Conte,* 157 Conn. 209, 212, 251 A.2d 81, cert. denied, 396 U.S. 964, 90 S. Ct. 439, 24 L. Ed. 2d 428 [1969]; *State* v. *Kenyon,* 134 Conn. 43, 49, 54 A.2d 585 [1947]; *State* v. *Joseph,* 96 Conn. 637, 639, 115 A. 85 [1921]' (emphasis added); see *State* v. *Dubina,* 164 Conn. 95, 100–101, 318 A.2d 95 [1972]; *State* v. *Vennard,* 159 Conn. 385, 404, 270 A.2d 837 [1970], cert. denied, 400 U.S. 1011, 91 S. Ct. 576, 27 L. Ed. 2d 625 [1971]." *State* v. *Holmquist,* 173 Conn. 140, 148–49, 376 A.2d 1111 (1977); see *State* v. *Perez,* 182 Conn. 603, 605, 438 A.2d 1149 (1981); *State* v. *Ontra,* 178 Conn. 480, 482, 423 A.2d 134 (1979).

In this case, the expert testimony adduced by the defendant can fairly be considered "substantial evidence tending to prove insanity." Although the state was not required to provide rebuttal evidence on this

issue; *State* v. *Holmquist,* supra; the burden did rest on the state to prove beyond a reasonable doubt that the defendant was legally sane. In discharging this burden, the state is under no obligation to produce expert testimony of sanity. See *State* v. *Ontra,* supra, 484–85; *State* v. *Vennard,* supra; *State* v. *Kenyon,* supra, 48–49.

Turning to our standard of review, we have repeatedly stated that our review of the conclusions of the trier of fact, whether it be a judge, a panel of judges or a jury, is limited. See, e.g., *State* v. *Brice,* 186 Conn. 449, 459, 442 A.2d 906 (1982); *State* v. *D'Antuono,* 186 Conn. 414, 421, 441 A.2d 846 (1982); *In re Juvenile Appeal (Docket No. 9268),* 184 Conn. 157, 169, 439 A.2d 958 (1981); *State* v. *Perez,* supra, 606. "This court will construe the evidence in the light most favorable to sustaining the trial court's [judgment] and will affirm the conclusion of the trier of fact if it is reasonably supported by the evidence and the logical inferences drawn therefrom. . . . The probative force of direct and circumstantial evidence is the same." (Citations omitted.) *State* v. *D'Antuono,* supra; see *State* v. *Vincent,* 194 Conn. 198, 206, 479 A.2d 237 (1984); *State* v. *Zdanis,* 182 Conn. 388, 391, 438 A.2d 696 (1980), cert. denied, 450 U.S. 1003, 101 S. Ct. 1715, 68 L. Ed. 2d 607 (1981). The weight to be given both the opinion evidence of expert witnesses and the lay evidence of sanity is for the trier of fact to determine and a trier may disbelieve all or any portion of the evidence tending to prove insanity or may construe such evidence contrary from the parties' assertions. *State* v. *Gordon,* 185 Conn. 402, 409, 441 A.2d 119 (1981), cert. denied, 455 U.S. 989, 102 S. Ct. 1612, 71 L. Ed. 2d 848 (1982); *State* v. *Smith,* 185 Conn. 63, 73–74, 441 A.2d 84 (1981); *State* v. *Ontra,* supra, 484. The credibility of expert witnesses is a matter to be determined by the trier of fact. *State* v. *Perez,* supra, 610; *State* v. *Cofone,* 164 Conn. 162, 165, 319 A.2d 381 (1972). "In its consideration of the testimony

of an expert witness, the trial court might weigh, as it sees fit, the expert's 'expertise, his opportunity to observe the defendant and to form an opinion, and his thoroughness. It might consider also the reasonableness of his judgments about the underlying facts and of the conclusions which he drew from them.' *State* v. *Perez,* supra, 610." *In re Juvenile Appeal (Docket No. 9268),* supra, 170. After applying these principles to our review of the record, we conclude that the majority of the three judge panel did not err in ultimately concluding that the state had proven beyond a reasonable doubt that the defendant was guilty of felony murder in violation of General Statutes § 53a-54c. This determination also properly included their conclusion that on December 1, 1980, the defendant broke into the victim's home "with the intent and for the purpose of burglarizing it" and that he killed the victim "while in the course of committing a felony."

Having already set out at some length certain evidence that was before the three judge panel, we examine the majority's memorandum of decision which sets out its subordinate facts and conclusions. We look first to those portions of the memorandum where the defendant claims that the majority made "virtually contradictory findings."

The panel properly found that the defendant "voluntarily gave a full statement of his criminal activities in Connecticut to the Michigan police and the Connecticut state police, independently, and on two separate days." Here we note that not only did the three judge panel hear and observe French and Schweitzer as they testified at length on the voir dire and at trial, but that the panel also played the tape recordings of each statement.[16]

---

[16] The defendant's tape recorded statement of December 4, 1980, was about one hour and twenty minutes in length. His tape recorded statement

The majority of the panel found that the defendant's two versions of what had occurred in Connecticut relevant to the aforesaid criminal activity were substantially and materially consistent with each other. At this point, it will be helpful to consider these determinations together. The first statement given in Michigan on December 4, 1980, was much longer than that given the following day.[17] A close examination of the two statements justifies the majority's finding that they were substantially and materially consistent with each other. As to his criminal activity, the two statements evidence a steady continuity throughout, inter sese, and they are essentially similar in legal character. This is not to say that they are absolutely consistent, but they are substantially and materially consistent. Briefly, and only by way of illustration, each indicates that he had intended, unemployed and without money as he was, to break into the victim's house and steal her money as well as her car keys. Each indicates that he had thought a long time about breaking into that house and taking her car. Each indicates that he had hoped that he could get in and get out, without her hearing him. Each indicates that he had known that she was deaf and was watching television that night on the first floor. Each indicates that he had gone through the house selecting items he thought might have value, had put them in one of the victim's suitcases and had driven to Michigan with them in the stolen car. Each indicates that he had taken money from her purse. Each indi-

given on December 5, 1980, was approximately forty-three minutes in length. The defendant himself did not testify either on voir dire or at trial.

[17] French, who took the statement of December 4, 1980, developed at some length the defendant's conduct and course after he had left Connecticut and particularly what he had done, where he had been and with whom he had spoken since he had entered Michigan in order to ascertain whether he had committed any crimes in that state.

cates that, as the victim lay at the bottom of the stairs, the defendant sat on her with his hand on her throat.[18]

The defendant contests the finding that the statements that he gave to the police were substantially and materially inconsistent with those given to Borden and Angliker who examined him some months later and especially as concerns his intent and motivation. We disagree. Despite the defendant's argument to the contrary, the evidence of his long psychiatric history was not uncontroverted.

The three judge panel had before it evidence, referred to above, which the majority could have credited that demonstrated not only that he had not been wholly candid in the account he gave to the two doctors but which objectively indicated a planned development and execution of the crimes of which he was found guilty.[19] In that connection, the defendant himself told the police that he had thought a lot about breaking into the victim's home, that as he crouched outside that night before going in, he pushed leaves over the shiny part of his boots, and that he was wearing an army jacket together with the hood of a wet suit and a black scarf covering his face. Additionally, he stated that after he broke in and smoked a cigarette upstairs, he was careful to put the unsmoked portion in his pocket, that he wore gloves and never took them off until he left the house, that he pulled out the telephone jack and put it in another room to get it away from the victim. He went on to say that he went through the house looking for

---

[18] The medical examiner indicated that the victim died of traumatic asphyxiation.

[19] During the course of the statements to the police, however, the defendant did say to French that he had "to face the fact that I'm mentally insane or whatever," that "I must be, I definitely have to be," that he was going to wait and talk to a psychiatrist and find out about himself. He also said that around Thanksgiving he tried to stab himself in the stomach but could not do so and ended up just punching the wall.

items of value and put them in a suitcase, that he went through the victim's pocketbook and took approximately eighty-five dollars in cash, that after he left the victim's house, he also put in her car items he had taken from the other two burglaries, and that while he spent at face value some of the coins he stole from the victim, he chose not to go to a coin collector's shop he passed to sell any as they might be traced. We also note that there was evidence that, as the defendant talked to the police, he was coherent, understood the questions, had a good recollection of the details of the crime and there was no suggestion that he was of low intelligence.

Thus, from the evidence presented, together with reasonable inferences drawn from it, the majority could reasonably have concluded that the defendant's versions to the psychiatrists, as set out above, were substantially and materially inconsistent with those given to the police, and, as the majority found, especially as to his intent and motivation.

It was the panel's function to consider, sift and weigh all the evidence including a determination as to whether any opinions given concerning the defendant's sanity were undercut or attenuated under all the circumstances. See, e.g., *In re Juvenile Appeal (Docket No. 9268),* supra, 170; *State* v. *Perez,* supra, 610. While expert testimony is of great assistance, the ultimate issue of sanity, including intent, is decided by the trier of fact. *In re Juvenile Appeal (Docket No. 9268),* supra; *State* v. *Perez,* supra; *State* v. *Kenyon,* supra; *People* v. *Denton,* 138 Mich. App. 568, 572, 360 N.W.2d 245 (1984). The discharge of this function by the majority was not, as we have shown, a summary rejection of the testimony of the defendant's experts as he appears to claim. The majority could permissibly find, as they did, that the defendant "understood and appreciated that it was wrong and against the law to commit burglary

and larceny, and he was not driven by an inner 'compulsion' to perpetrate [the crimes]." They could also properly find, as they did, that the defendant was capable of forming an intent to commit burglary and larceny "free of any compulsion to do so by reason of a mental disease." "In order to obtain a conviction for felony murder the state must prove, beyond a reasonable doubt, all the elements of the statutorily designated underlying felony, and in addition, that a death was caused in the course of and in furtherance of that felony. General Statutes § 53a-54c. There is no requirement that the state prove an intent to cause death." *State* v. *Castro,* 196 Conn. 421, 428–29, 493 A.2d 223 (1985).

Upon a review of the record before us, including the evidence of the two experts, the lay witnesses and the exhibits, we conclude that the majority of the three judge panel could reasonably have found proven beyond a reasonable doubt that the defendant was criminally responsible pursuant to the standard in General Statutes § 53a-13 and that he was guilty of felony murder in violation of General Statutes § 53a-54c.

There is no error.

In this opinion SHEA, DANNEHY and GLASS, Js., concurred.

PETERS, C. J., dissenting. I agree that the defendant's statements were admissible, in light of *Colorado* v. *Connelly,* 479 U.S. 157, 107 S. Ct. 515, 93 L. Ed. 2d 473 (1986), and the defendant's failure to present any reasoned argument that the Connecticut constitution affords him greater rights than those available to him under the United States constitution. I do not agree, however, that the state has sustained its burden of proving, beyond a reasonable doubt, that the defendant was legally sane when he committed the acts of which he stands convicted.

As the majority opinion acknowledges, both of the experts who testified at the defendant's trial were unconditionally of the view that the defendant then was, and for many years had been, a severely paranoid schizophrenic with delusions of persecution and marked thought disorders. Arguably, the testimony of Dr. Walter A. Borden might have been discredited by the trial court because this psychiatrist saw the defendant only briefly and did not have access to the tape recordings of the defendant's statements to the police at the time of his arrest. No such infirmities undermine the testimony of Dr. Colin C.J. Angliker, the psychiatrist who initially examined the defendant at the request of the state but ultimately testified on behalf of the defendant. Dr. Angliker examined the defendant for approximately six hours, and had before him a transcript of the defendant's confession and a copy of Dr. Borden's report, which contained detailed references to the defendant's prior history of psychiatric hospitalization. During the defendant's hospitalization in January, 1980, well before the occurrence of the crime of which he was convicted, the defendant had warned that he would "kill someone" and that he believed himself to be a "Ninja" who had to kill. Both of these psychiatrists stated that, in their expert opinion, the defendant, because of his paranoid schizophrenia, lacked substantial capacity either to appreciate the wrongfulness of his behavior at the time of the crime or to conform his conduct to the requirements of the law.

To rebut this massive evidence of prolonged and severe mental impairment, the state relied primarily on the accuracy of the defendant's voluntary statements to the police. Even taking these statements at face value, they prove only that the defendant's conduct was intentional, not that his intentional conduct was not substantially derived from his mental illness.

Under our governing statutes, mental illness may affect criminal liability in one of two ways, either to diminish the degree of criminal culpability or to avoid criminal reponsibility entirely. In some circumstances, an extreme emotional disturbance, a mental disease, a mental defect or other mental abnormality may cause a defendant to be incapable of having the specific intent required for culpability of first degree or felony murder. Pursuant to General Statutes § 53a-54a, such a defendant may, despite his mental impairment, be guilty of a lesser crime such as manslaughter. See, e.g., *State* v. *Asherman,* 193 Conn. 695, 729–33, 478 A.2d 227 (1984), cert. denied, 470 U.S. 1050, 105 S. Ct. 1749, 84 L. Ed. 2d 814 (1985). In other circumstances, however, as delineated by General Statutes § 53a-13, the legal consequence of a mental disability is much more far reaching. A defendant who, as a result of mental disease or defect, lacks substantial capacity either to appreciate the wrongfulness of his conduct or to conform that conduct to the requirements of the law is technically labeled guilty but is absolved of all criminal responsibility for his behavior. This distinction between diminished capacity and lack of criminal responsibility is well recognized in scholarly writings about the role of insanity in our criminal law. See, e.g., 1 P. Robinson, Criminal Law Defenses (1984) § 64 (a), p. 273; W. LaFave & A. Scott, Criminal Law (1972) pp. 325–27; A. Goldstein, The Insanity Defense (1967) pp. 193–202.

As I read the record before the trial court in the present case, I would agree that the defendant's own statements, if credited by the trier of fact, would sufficiently evidence that his conduct was intentional for the purposes of § 53a-54a. Those statements in no way demonstrate, however, that his conduct met the requirements of § 53a-13. To my mind, the lay observations of the police officers who took the defendant's

statements do not suffice to fill this evidentiary gap. Nothing in their testimony persuades me that they were able to discern whether the defendant's intentional misconduct was the result of sane and criminal miscreancy or insane and legally excused delusion. What they could not discern, the state has not proven.

Accordingly, like Judge L. Dorsey in the trial court, I dissent.