******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

EVELEIGH, J., with whom McDONALD and VERTE-FEUILLE, Js., join, dissenting. I respectfully dissent from the majority opinion. First, unlike the majority's conclusion that the testimony at issue was "collateral," I would adhere to our long-standing jurisprudence that "evidence tending to show a witness' bias, prejudice or interest is never collateral . . . ." (Citation omitted.) Conn. Code Evid. § 6-5, commentary; see also *State* v. *Chance*, 236 Conn. 31, 58, 671 A.2d 323 (1996). In my view, the evidence did relate to a substantial issue in the present case—namely, the credibility of Andrew Bazos, the only expert witness presented by the defendants Dennis M. Rodin and Waterbury Orthopaedic Associates, P.C.[1] Second, unlike the majority, I would conclude that instead of weighing the "competing interests," the trial court not only unnecessarily restricted the ability of the plaintiff Philip Filippelli III[2] to cross-examine Bazos, but also provided a solution that was without meaning and which was potentially confusing to the jury. Thus, in my view, the plaintiff's right to cross-examine Bazos regarding motive, interest, bias and prejudice was unduly restricted. See *Vazquez* v. *Rocco*, 267 Conn. 59, 66, 836 A.2d 1158 (2003).

The present appeal arises from a medical malpractice action. In my view, the dispositive issue in this appeal is whether the trial court properly precluded the plaintiff from cross-examining Bazos with allegedly misleading and inconsistent deposition testimony.[3] The trial court precluded the plaintiff's cross-examination on the ground that the deposition testimony at issue was more prejudicial than probative. The trial court reached this conclusion because the proffered evidence revealed that Rodin was a defendant in two other medical malpractice cases. After a jury trial, the trial court rendered judgment in favor of the defendants. The plaintiff then appealed to the Appellate Court, which affirmed the trial court's judgment. *Filippelli* v. *Saint Mary's Hospital*, 141 Conn. App. 594, 597–600, 61 A.3d 1198 (2013). This certified appeal followed. *Filippelli* v. *Saint Mary's Hospital*, 308 Conn. 947, 67 A.3d 289 (2013).

I recognize that a trial court has broad discretion in ruling on the admissibility of evidence and that we will not disturb such a decision in the absence of an abuse of discretion. See, e.g., *Statewide Grievance Committee* v. *Burton*, 299 Conn. 405, 415, 10 A.3d 507 (2011). "Nevertheless, [t]he exercise of discretion to omit evidence in a civil case should be viewed more critically than the exercise of discretion to include evidence. It is usually possible through instructions or admonitions to the jury to cure any damage due to inclusion of evidence, whereas it is impossible to cure any damage due to the exclusion of evidence." (Internal quotation marks

omitted.) *Hayes* v. *Manchester Memorial Hospital*, 38 Conn. App. 471, 474, 661 A.2d 123, cert. denied, 235 Conn. 922, 666 A.2d 1185 (1995). It is through the lens of a more critical analysis that I would conclude that the trial court's decision improperly limited the cross-examination of the defendants' single expert witness harmed the plaintiff. Accordingly, I would reverse the judgment of the Appellate Court and remand the case for a new trial.[4]

The Appellate Court opinion sets forth the following procedural history regarding the plaintiff's claim.[5] "Bazos was deposed by the plaintiff's counsel on April 4, 2011, approximately one month prior to the start of trial. He testified, in part, that he had been disclosed as an expert witness in three or four unrelated medical malpractice actions, but that he could recall the name of only one of those cases, an action that did not involve Rodin. Bazos also testified that he did not know Rodin. When the plaintiff's counsel asked Bazos if he had heard of Rodin previously, Bazos testified that he may have seen Rodin's name on medical records that came across his desk in the course of his medical practice, as Rodin practices in a community near to the one in which Bazos practices.

"On May 6, 2011, the court held a hearing on numerous motions in limine filed by the parties. One of the defendants' motions in limine sought to preclude the plaintiff from presenting evidence of other medical malpractice actions in which Rodin was a defendant, arguing that such evidence is irrelevant to the question of whether Rodin had breached the standard of care in his care and treatment of the plaintiff and was more prejudicial than probative. The defendants' motion in limine cited the relevancy section of our [C]ode of [E]vidence. See Conn. Code Evid. § 4-1 et seq.

"In opposing the defendants' motion in limine, the plaintiff's counsel stated that she did not intend to question Rodin about prior or pending medical malpractice actions against him, but that she planned to question Bazos about the number of times he had given expert testimony on Rodin's behalf. She also stated that Bazos had been deposed in another action involving Rodin approximately one month prior to his being deposed in [the present] case, but Bazos was unable to recall that fact when the plaintiff deposed him. According to the plaintiff's counsel, Bazos' deposition testimony in this case was untruthful. . . . The plaintiff intended to use the deposition transcript to impeach Bazos' credibility and to demonstrate his bias.

"Counsel for the defendants argued that, when testifying at the subject deposition, Bazos had misunderstood the question from the plaintiff's counsel, believing that she was asking him about testimony given at trial, not at a deposition. Counsel for the defendants stated that Bazos was truthful in that he had never met Rodin

and that his relationship is with her and her firm, not Rodin. Moreover, Bazos intended to use an errata sheet to amend his deposition testimony in this case to indicate the number of times he had given testimony on behalf of Rodin. Counsel for the defendants argued that evidence of the number of times Bazos served as an expert witness for Rodin was a backdoor way of getting the number of malpractice actions against Rodin before the jury, regardless of the merits of those actions.

"The court agreed that evidence regarding other medical malpractice claims against Rodin was more prejudicial than probative, but stated that the plaintiff was entitled to inquire whether Bazos was 'looking at . . . Rodin for the first time.' The court therefore granted the defendants' motion in limine in part, but denied it in part to permit the plaintiff's counsel to inquire of Bazos as to any prior working relationship he had with Rodin.

"At trial, prior to cross-examining Bazos, the plaintiff's counsel requested a sidebar conference. Thereafter, the court excused the jury and asked Bazos to step outside the courtroom. [The] [p]laintiff's counsel stated her desire to question Bazos about other deposition testimony he had given on behalf of Rodin. She stated that, during his deposition in this case, Bazos testified that he did not know Rodin but that he may have seen his name in medical records. Moreover, Bazos could recall the name of only one case in which he had testified as an expert. [The] [p]laintiff's counsel stated that Bazos gave a deposition on Rodin's behalf in the case of *George* v. *Rodin*, Superior Court, judicial district of Waterbury, Docket No. CV-09-5014966-S, approximately two months prior to the day he was deposed in this action. Five days prior to the deposition in this case, Bazos signed the deposition errata sheet in *George* . . . but testified that he could not recall the names of any other cases in which he had testified. [The] [p]laintiff's counsel argued that Bazos' deposition testimony, therefore, was not truthful.

"The court pointed out that, if it were to permit the plaintiff to question Bazos about *George* . . . in front of the jury and Bazos admitted that he is an expert in that case, evidence of another medical malpractice claim against Rodin would be before the jury. [The] [p]laintiff's counsel argued that Bazos denied, under oath, knowing the names of the cases in which he had been disclosed as an expert witness and that such evidence was necessary for the jury to determine Bazos' credibility, which went to the heart of his veracity and whether he was truthful.

"The court denied the plaintiff's request to make an offer of proof, ruling that the plaintiff could ask Bazos whether he had a working relationship with Rodin and that he could challenge Bazos' credibility, but not with evidence of other medical malpractice claims against

Rodin, as its prejudicial value far outweighs its probative value.

"At the end of the court day, after Bazos had completed his testimony and the jury had been excused, the plaintiff sought to mark a document for identification. The court declined the plaintiff's request, but permitted counsel to make an oral record.[6] Plaintiff's counsel identified the document as 'the witness certification for [a] deposition that was taken on January 21, 2011. The certification was witnessed on March 29, 2011, by . . . Bazos in . . . *George* . . . .' " (Citation omitted; footnotes altered.) *Filippelli* v. *Saint Mary's Hospital*, supra, 141 Conn. App. 614–19.

Although I agree generally with the standard of review set forth in the majority opinion, I set forth our well established standard of review to frame my analysis of the plaintiff's claim. "The standard under which we review evidentiary claims depends on the specific nature of the claim presented. . . . To the extent a trial court's admission of evidence is based on an interpretation of [law], our standard of review is plenary. . . . We review the trial court's decision to admit evidence, if premised on a correct view of the law, however, for an abuse of discretion." (Citations omitted; internal quotation marks omitted.) *Statewide Grievance Committee* v. *Burton*, supra, 299 Conn. 415; see also *State* v. *Saucier*, 283 Conn. 207, 218, 926 A.2d 633 (2007).

"Nevertheless, '[t]he exercise of discretion to omit evidence in a civil case should be viewed more critically than the exercise of discretion to include evidence. It is usually possible through instructions or admonitions to the jury to cure any damage due to inclusion of evidence, whereas it is impossible to cure any damage due to the exclusion of evidence.' *Larensen* v. *Karp*, 1 Conn. App. 228, 237, 470 A.2d 715 (1984) (*Dupont, J.*, dissenting); see also *Batick* v. *Seymour*, 186 Conn. 632, 637, 443 A.2d 471 (1982) (suggesting that standard for admitting evidence that is challenged as prejudicial should be lower in civil case than in criminal case); C. Tait & J. LaPlante, [Connecticut Evidence (2d Ed. 1988)] § 8.1.3. 'To be excluded the evidence must create prejudice that is undue and so great as to threaten an injustice if the evidence were to be admitted.' . . . *Chouinard* v. *Marjani*, [21 Conn. App. 572, 576, 575 A.2d 238 (1990)]; see also *Richmond* v. *Longo*, 27 Conn. App. 30, 39, 604 A.2d 374, cert. denied, 222 Conn. 902, 606 A.2d 1328 (1992)." (Emphasis omitted.) *Martins* v. *Connecticut Light & Power Co.*, 35 Conn. App. 212, 217–18, 645 A.2d 557 (1994); see also *Hayes* v. *Manchester Memorial Hospital*, supra, 38 Conn. App. 474.

In the present case, Bazos testified at his deposition that he had testified as an expert in three or four other medical malpractice cases over a period of six years prior to his deposition. When asked whether he knew

the names of any of the physicians for whom he had been disclosed as a witness and given testimony, Bazos testified "[t]he only one I remember, because it was relatively recent, was [a physician named] Geiger . . . ."

When asked if he knew any of the physicians that subsequently treated the plaintiff, Bazos testified that he did not know them personally and had not worked with any of them. When asked if he had ever heard of Rodin before being involved in this case, Bazos testified that "I've seen his name; I've not worked with him, but Waterbury is not that far away, and we'll occasionally see patients that live there and may have been treated out there in the past."[7] During his entire deposition, Bazos never mentioned that he had been retained by the defendants' counsel as an expert witness in other medical malpractice cases in which Rodin was named as a defendant.

Contrary to his testimony at his deposition, a review of the record indicates that of the four medical malpractice cases for which Bazos had been retained and given testimony, he testified on behalf of Rodin in three of them. In each of those matters, Bazos had also been retained by the defendants' counsel. Bazos had given a deposition approximately two months before his deposition in this case in another case involving Rodin. Indeed, while meeting with the defendants' counsel to prepare for his deposition in the present case, Bazos signed an errata sheet for his deposition in that other case involving Rodin.

On the basis of the foregoing, the plaintiff asserts that Bazos lied under oath at his deposition and that the trial court improperly precluded him from impeaching Bazos at trial with the allegedly untruthful testimony from his deposition. The defendants respond that Bazos' testimony was not misleading and that, even if it was, it was proper for the trial court to exclude it because it was more prejudicial than probative. I agree with the plaintiff and would conclude that evidence regarding Bazos' misleading testimony at his deposition was admissible as both evidence of bias and a specific incident of misconduct relating to veracity.

The majority concludes that "whether Bazos previously served as an expert on behalf of Rodin was a collateral matter because it was relevant only to Bazos' credibility and not to any substantive issue in the case." I disagree. It is well established that "evidence tending to show a witness' bias, prejudice or interest is never collateral . . . ." (Citation omitted.) Conn. Code Evid. § 6-5, commentary. " '[C]ross-examination is the principal means by which the credibility of witnesses and the truth of their testimony is tested.' *State* v. *Lee*, 229 Conn. 60, 69, 640 A.2d 553 (1994). Although only relevant evidence may be elicited through cross-examination; *State* v. *Kelley*, 229 Conn. 557, 562, 643 A.2d 854 (1994); '[e]vi-

dence tending to show motive, bias or interest of an important witness is never collateral or irrelevant. [Indeed, it] may be . . . the very key to an intelligent appraisal of the testimony of the [witness].' . . . *State* v. *Colton*, 227 Conn. 231, 248, 630 A.2d 577 (1993)." *State* v. *Chance*, supra, 236 Conn. 58. As this court explained in *Vasquez* v. *Rocco*, supra, 267 Conn. 66–67, "the risk of undue prejudice to the defendant resulting from the introduction of such evidence must be weighed against the plaintiff's right of cross-examination regarding motive, interest, bias or prejudice, a right that may not be unduly restricted. E.g., *Pet* v. *Dept. of Health Services*, 228 Conn. 651, 663, 638 A.2d 6 (1994); see also General Statutes § 52-145 (b) ('[a] person's interest in the outcome of the action . . . may be shown for the purpose of affecting his credibility'); Conn. Code Evid. § 6-5 ('[t]he credibility of a witness may be impeached by evidence showing bias for, prejudice against, or interest in any person or matter that might cause the witness to testify falsely'). Furthermore, '[a] basic and proper purpose of cross-examination of an expert is to test that expert's credibility.' . . . *State* v. *Copas*, [252 Conn. 318, 327, 746 A.2d 761 (2000)]."

" 'The bias of a witness, like prejudice and relationship, is not a collateral matter. The bias of a witness is always a relevant subject of inquiry when confined to ascertaining [a] previous relationship, feeling and conduct of the witness . . . . [O]n cross-examination great latitude is allowed and . . . the general rule is that anything tending to show the bias on the part of a witness may be drawn out.' [*Henson* v. *Commonwealth*, 165 Va. 821, 825–26, 183 S.E. 435 (1936); see also] *Norfolk & Western Railway Co.* v. *Birchfield*, 105 Va. 809, 812, [54 S.E. 879] (1906) (repeating the general rule but concluding under the circumstances of that case that it was harmless error not to permit a particular question because the information sought by the questioner was developed by other evidence)." (Emphasis omitted.) *Henning* v. *Thomas*, 235 Va. 181, 188, 366 S.E.2d 109 (1988).

In the present case, the fact that Bazos had been retained by the defendants' counsel in two other matters on behalf of Rodin was relevant to the issue of his potential bias or interest in the outcome of the case. In *Vasquez* v. *Rocco*, supra, 267 Conn. 65, this court addressed a similar issue. In *Vasquez*, the plaintiff sought to cross-examine the defendant's expert regarding his connection to the defendant's liability insurance carrier. Id., 64. The trial court precluded the plaintiff from cross-examining the defendant's expert on the ground that the probative value of the evidence would be outweighed by its prejudicial effect. Id., 64–65. This court concluded that the trial court improperly precluded the plaintiff from cross-examining the expert because the expert's connection to the insurance carrier "was substantial enough to warrant the admission of

evidence of that connection for the purpose of demonstrating [the expert's] potential interest in the outcome of the case." Id., 69. Indeed, this court has recognized that " '[i]t is usually held that it is permissible for plaintiff's counsel, when acting in good faith, to show the relationship between a witness and [the] defendant's insurance company where such evidence tends to show the interest or bias of the witness and affects the weight to be accorded his testimony.' Annot., 4 A.L.R.2d 761, [§ 7 (1949)]." *Magnon* v. *Glickman*, 185 Conn. 234, 242, 440 A.2d 909 (1981).

This view is consistent with the approach of other jurisdictions that allow cross-examination of medical experts as to specific prior referrals from attorneys involved in the present case and testimony on behalf of clients of the attorney. Indeed, the Supreme Court of Illinois has explained the rationale for allowing such cross-examination as follows: "The modern personal injury trial often becomes a battle between expert witnesses. This is particularly true in a case [in which the cause of the] injury is beyond the knowledge of the average person, and a jury must ordinarily rely on the testimony of experts in reaching a verdict. . . . An expert medical witness is an important part of the technique of personal injury litigation. He generally is a persuasive, fluent, impressive witness, able to make the jury understand that what he is telling them is the product of years of educational preparation and medical experience, with particular reference to and emphasis on the specialty involved. He will name his colleges and universities, his degrees, the medical societies to which he belongs, the national specialty groups to which he has been admitted, the hospitals in which he has interned or externed, and the hospital staffs on which he has held positions. . . . That he is being paid by one side is always skillfully lost in casual answers to cross-examining cynical questions, by a modest shrug indicating that a charge is made per hour or day, which seems wholly inconsequent to the large proportions from which his great capacities emerge." (Internal quotation marks omitted.) *Sears* v. *Rutishauser*, 102 Ill. 2d 402, 406, 466 N.E.2d 210 (1984). Accordingly, the Supreme Court of Illinois explained that "[i]t is competent to show that a witness . . . is in the employ of one of the litigants regularly or frequently as an expert witness, or to prove facts and circumstances which would naturally create a bias in the mind of the witness for or against the cause of either of the litigants." (Internal quotation marks omitted.) Id., 407. "A medical expert can be questioned about fee arrangements, prior testimony for the same party, and financial interest in the outcome of the case." Id., 408.

In *Sawyer* v. *Comerci*, 264 Va. 68, 77–80, 563 S.E.2d 748 (2002), the Supreme Court of Virginia addressed a very similar issue to the present case—whether a trial court properly precluded the plaintiff in a medical mal-

practice action from cross-examining the defendant's expert to show that he had previously testified on behalf of the defendant and had been compensated for his testimony. The Supreme Court of Virginia concluded that the trial court abused its discretion in refusing to permit the plaintiff to elicit testimony from the defendant's expert related to his testimony in an unrelated action. Id., 79–80. The Supreme Court of Virginia explained as follows: "[I]n this case the plaintiff was entitled to cross-examine the defendant's expert witness . . . to show that he had previously testified as an expert witness on behalf of [the defendant] and that he had been compensated. The amount of money that [the defendant] paid [the defendant's expert] in a prior case was a relevant area of inquiry because that testimony may have indicated to the jury that he was biased in her favor. The probative value concerning this potential bias outweighed any prejudice to [the defendant] resulting from the jury's knowledge that she had been a defendant in an unrelated [action]. Therefore, the circuit court abused its discretion in failing to permit the plaintiff to elicit this testimony." Id. Accordingly, the Supreme Court of Virginia reversed the judgment of the trial court and remanded the case for a new trial. Id., 80.

Furthermore, the plaintiff in the present case should have been allowed to cross-examine Bazos regarding his inconsistent testimony at the deposition because prior inconsistent testimony was relevant to his credibility. It is axiomatic that "[a] witness may be impeached by specific acts of misconduct that evidence a lack of veracity." C. Tait & E. Prescott, Connecticut Evidence (5th Ed. 2014) § 6.32.2, p. 397. This court has repeatedly concluded that "[t]o attack the credibility of a witness, inquiry may be made, in the discretion of the trial court, as to particular acts of misconduct tending to show a lack of veracity even though such evidence may be irrelevant to the issues in the case." *State* v. *Sharpe*, 195 Conn. 651, 658, 491 A.2d 345 (1985). "In an attack on his credit, inquiry may be made, in the discretion of the court, as to particular acts of misconduct tending to show a lack of veracity, even though such evidence might be irrelevant to the issues in the case. *Vogel* v. *Sylvester*, [148 Conn. 666, 675, 174 A.2d 122 (1961)]; *Shailer* v. *Bullock*, [78 Conn. 65, 69, 61 A. 65 (1905)]; [C. McCormick, Evidence (1954)] § 42." *Martyn* v. *Donlin*, 151 Conn. 402, 408, 198 A.2d 700 (1964).

Lying under oath is a clear example of lack of veracity. *State* v. *Suarez*, 23 Conn. App. 705, 709, 584 A.2d 1194 (1990). Indeed, this court recently concluded that "[a] claim that the witness gave false testimony in a prior case is directly relevant to a witness' credibility. See, e.g., *State* v. *Bova*, 240 Conn. 210, 223, 690 A.2d 1370 (1997)." *Weaver* v. *McKnight*, 313 Conn. 393, 427, 97 A.3d 920 (2014). Nevertheless, "[b]efore a witness may be asked about his or her prior acts of misconduct,

the questioner must have a good-faith basis for believing that the witness has committed the act inquired about." C. Tait & E. Prescott, supra, § 6.32.4, p. 400.

"Cross-examination is an indispensable means of eliciting facts that may raise questions about the credibility of witnesses and, as a substantial legal right, it may not be abrogated or abridged at the discretion of the court to the prejudice of the party conducting that cross-examination. *Richmond* v. *Longo*, [supra, 27 Conn. App. 38]. It is well settled that the credibility of an expert witness is a matter to be determined by the trier of fact. *In re Juvenile Appeal*, 184 Conn. 157, 170, 439 A.2d 958 (1981)." *Hayes* v. *Manchester Memorial Hospital*, supra, 38 Conn. App. 474.

In the present case, the parties do not dispute that, at the time of his deposition in the present case, Bazos had been retained by counsel for the defendants to be an expert witness on behalf of Rodin in two other medical malpractice cases. The parties also do not dispute that Bazos had testified at a deposition in one of the other medical malpractice cases involving Rodin approximately two months prior to his deposition in the present case. Further, it is undisputed that on the day Bazos met with counsel for the defendants to prepare for the deposition in the present case, five days before the deposition in the present case, he signed an errata sheet for a deposition in another case in which Rodin was named as the defendant.

At his deposition, Bazos testified that he had given testimony in three or four other medical malpractice cases. Bazos was asked the following question: "Do you remember the names of any of the physicians for which you have given deposition testimony as a disclosed expert on their behalf?" Bazos replied, "[t]he only one I remember, because it was relatively recent, was . . . Geiger . . . ." Indeed, when explicitly asked if he had ever heard of Rodin before, Bazos replied as follows: "I've seen his name; I've not worked with him, but Waterbury is not that far away, and we'll occasionally see patients that live there and may have been treated out there in the past." This testimony by Bazos implies that his only knowledge of Rodin was through records of patients that Bazos treated. Such testimony completely omits the fact that he had reviewed records in other medical malpractice cases in which Rodin was named as a defendant and that Bazos was hired as an expert in those cases. Given the fact that it is undisputed that Bazos gave deposition testimony in a case where Rodin was the named defendant approximately two months prior to his deposition in the present case, and the fact that the deposition in the case involving Geiger was approximately one year before, I conclude that the plaintiff had a good faith belief that Bazos had lied under oath.[8]

The majority states that the trial court "also recog-

nized . . . that the plaintiff had a legitimate interest in impeaching Bazos' credibility by questioning him about his allegedly false or misleading deposition testimony. The court sought to balance these concerns by allowing the plaintiff to confront Bazos with the portion of his deposition testimony in which he stated that he was only familiar with Rodin's name because he had seen it in his patients' medical records and ask whether Bazos had a 'working relationship' with Rodin, but precluded the plaintiff from inquiring more specifically about other malpractice cases against Rodin." I disagree. By limiting the plaintiff to being able to ask only about a "prior working relationship" with Rodin, it did not enable the plaintiff to elicit the fact that Bazos had not been forthcoming about his relationship with Rodin. The vague notion of "prior working relationship" did not convey the extent to which the testimony Bazos gave at his deposition may have been misleading and not forthright. Specifically, the trial court precluded the plaintiff from questioning Bazos regarding whether he had falsely testified during his deposition. Specifically, the trial court allowed the plaintiff to inquire into whether Bazos had a "working relationship" with Rodin, but precluded the plaintiff from introducing evidence that Bazos had omitted from his deposition testimony that he had been disclosed as an expert and testified on behalf of Rodin in other cases. The trial court precluded the plaintiff from introducing evidence that Bazos may have lied at his deposition about being disclosed as an expert in two other actions involving Rodin on the ground that information regarding the other medical malpractice actions involving Rodin would have been more prejudicial than probative. The exact nature of this "prior working relationship" was never explained to the jury and was potentially a source of confusion. What exactly does it mean? Were they partners? Did one work for the other and refer patients? Did they share one mutual patient at a given time? Were they residents in the same hospital? The fact was potentially very confusing to the jury and of limited evidentiary value. It certainly cannot compare to the potential of suggesting to the jury that Bazos may have lied under oath and may have had a bias and interest to testify in favor of Rodin.

At trial, the plaintiff was allowed to question Bazos about whether he had an ongoing working relationship with Rodin. Bazos testified that he had an indirect ongoing relationship with Rodin, but that he met him for the first time the previous day.[9] By being limited to questioning Bazos only about their "working relationship," the plaintiff was never able to introduce evidence that, at his deposition, Bazos had omitted any reference to testifying on behalf of Rodin at other depositions or being named as an expert on Rodin's behalf in other matters.

Indeed, once Bazos testified at trial that he had "an

indirect working relationship with Rodin," Bazos' deposition testimony became a potential inconsistent statement under oath. It is well established that "[a] witness can be impeached by proof that he or she has made prior statements, either out-of-court or in a former proceeding, that are inconsistent with the [witness'] in-court testimony." C. Tait & E. Prescott, supra, § 6.35.2, p. 417. "Inconsistencies may be shown not only by contradictory statements but also by omissions, in other words, failures to mention certain facts. Thus, if the prior statement fails to mention a material fact presently testified to that it should have been natural to mention in the prior statement, the prior statement is sufficiently inconsistent. *State* v. *Reed*, [174 Conn. 287, 302–303, 386 A.2d 243 (1978)]." (Internal quotation marks omitted.) *Falls* v. *Loew's Theatres, Inc.*, 46 Conn. App. 610, 615, 700 A.2d 76 (1997); id. (concluding it was improper for trial court to exclude witness' prior inconsistent statement for impeachment purposes).

In the present case, Bazos' omission in his deposition testimony that he had testified on behalf of Rodin when that testimony occurred approximately two months prior to his deposition and he signed an errata sheet approximately five days before the deposition in a case in which Rodin was the named defendant was relevant to his veracity and possible inconsistency. I recognize that, "even if the conduct does relate to veracity, the court still has discretion to exclude it if the evidence has slight relevance due to remoteness in time or other considerations . . . or if it has a tendency to confuse or impede the litigation by interjecting collateral issues . . . ." (Citations omitted.) C. Tait & E. Prescott, supra, § 6.32.4, pp. 399–400. Nevertheless, in the present case, Bazos' conduct at his deposition was not remote in time—it occurred one month before trial. Moreover, although the trial court was worried about the prejudicial effect of evidence regarding the other medical malpractice actions, I would conclude that any prejudicial effect could have been resolved by a limiting instruction to the jury as to its use of the evidence and a further appropriate limitation that allowed the plaintiff to introduce only evidence that Bazos had not revealed that he testified on behalf of Rodin approximately one month prior to his deposition and had been retained in other actions without getting into the merits of those other actions. "Evidence may be admitted for impeachment purposes even though it is inadmissible as substantive evidence on the merits of the case. See [Conn. Code Evid.] § 1-4 . . . . In admitting such evidence, the jury should be instructed as to the proper and limited purpose for which it was received. . . . That the evidence might be misused by the jury in violation of the court's instructions is not grounds for excluding it." (Citations omitted.) C. Tait & E. Prescott, supra, § 6.27.6, pp. 385–86.

As the Supreme Court of Illinois explained: "The prin-

cipal safeguard against errant expert testimony is cross-examination. Generally, opposing counsel may probe bias, partisanship or financial interest of an expert witness on cross-examination. . . . It is competent to show that a witness . . . is in the employ of one of the litigants regularly or frequently as an expert witness, or to prove facts and circumstances which would naturally create a bias in the mind of the witness for or against the cause of either of the litigants." (Citation omitted; internal quotation marks omitted.) *Sears* v. *Rutishauser*, supra, 102 Ill. 2d 407. In the present case, the plaintiff was not given the opportunity to employ this important safeguard.

Accordingly, I would conclude that the trial court abused its discretion by precluding the plaintiff from inquiring into, and introducing evidence relevant to, whether Bazos had given misleading and inconsistent testimony at his deposition about his relationship with Rodin, and by limiting the plaintiff to only inquiring into the "working relationship" between Bazos and Rodin.

Having concluded that the trial court abused its discretion, I must now determine whether the evidentiary impropriety was harmless. "[A]n evidentiary ruling will result in a new trial only if the ruling was both wrong and harmful. . . . Moreover, an evidentiary impropriety in a civil case is harmless only if we have a fair assurance that it did not affect the jury's verdict." (Citations omitted; footnote omitted; internal quotation marks omitted.) *Hayes* v. *Camel*, 283 Conn. 475, 488–89, 927 A.2d 880 (2007).

" 'A determination of harm requires us to evaluate the effect of the evidentiary impropriety in the context of the totality of the evidence adduced at trial. *Vasquez* v. *Rocco*, [supra, 267 Conn. 72]. Thus, [my] analysis includes a review of: (1) the relationship of the improper evidence to the central issues in the case, particularly as highlighted by the parties' summations; (2) whether the trial court took any measures, such as corrective instructions, that might mitigate the effect of the evidentiary impropriety; and (3) whether the improperly admitted evidence is merely cumulative of other validly admitted testimony. . . . *Prentice* v. *Dalco Electric, Inc.*, [280 Conn. 336, 358, 907 A.2d 1204 (2006), cert. denied, 549 U.S. 1266, 127 S. Ct. 1494, 167 L. Ed. 2d 230 (2007)]; see also id., 360–61 (noting that during summation, plaintiff described issue encompassing improperly admitted scientific evidence as critical and emphasized that evidence); *Hayes* v. *Caspers, Ltd.*, 90 Conn. App. 781, 800, 881 A.2d 428 (cautionary instruction addressed prejudicial impact of expert's testimony that included arguably improper discussion of pending federal action), cert. denied, 276 Conn. 915, 888 A.2d 84 (2005); *Raudat* v. *Leary*, 88 Conn. App. 44, 52–53, 868 A.2d 120 (2005) (improperly admitted expert testimony was harmful error when it related to central issue in

case, namely, condition of purchased horse); *DeMarkey* v. *Fratturo*, [80 Conn. App. 650, 656–57, 836 A.2d 1257 (2003)] (improperly admitted hearsay evidence about cause of motor vehicle accident was harmless because it was cumulative of properly admitted testimonial and diagram evidence). The overriding question is whether the trial court's improper ruling affected the jury's perception of the remaining evidence. *Swenson* v. *Sawoska*, 215 Conn. 148, 153, 575 A.2d 206 (1990).' . . . *Hayes* v. *Camel*, supra, 283 Conn. 489–90." *Sullivan* v. *Metro-North Commuter Railroad Co.*, 292 Conn. 150, 162–63, 971 A.2d 676 (2009); see also *Kortner* v. *Martise*, 312 Conn. 1, 28–29, 91 A.3d 412 (2014).

In the present case, an evaluation of these factors demonstrates that the trial court's improper exclusion of evidence bearing on Bazos' credibility was harmful. First, Bazos' credibility was essential to the case. Bazos was the only expert who testified for the defendants. His testimony was essential to the key issue in the case—namely, whether the defendants had breached the standard of care. Bazos' testimony contradicted the testimony of the plaintiff's only expert, Ronald Krasnick. Therefore, the jury was left to determine which of the two experts it believed—a battle of the experts.

It is well established that "[t]he success of much litigation—both criminal and civil—is dependent upon the effectiveness of a litigant's expert witness. Generally, the cross-examination of an expert allows for wide-ranging questioning which touches on all matters testified to in chief, or which tends to test the qualifications, skill, or knowledge of the witness and the accuracy or value of his or her opinion." Annot., 11 A.L.R.5th 1 (1993). Indeed, this court has repeatedly stated that "[w]hen experts' opinions conflict, as often happens in medical malpractice cases, '[i]t is the province of the jury to weigh the evidence and determine the credibility and the effect of testimony . . . . [T]he jury is free to accept or reject each expert's opinion in whole or in part.' " *Grondin* v. *Curi*, 262 Conn. 637, 657 n.20, 817 A.2d 61 (2003). In the present case, the experts' opinions did conflict and the jury was left to determine which expert it believed. In such a case, the credibility of the defendants' expert was essential to the jury's ultimate resolution of the case—it had to decide whether to accept or reject his opinion. Therefore, Bazos' credibility was central to this case.

Second, the trial court did not attempt to cure any possible prejudice caused by the improper exclusion of the testimony. To the contrary, as explained previously in this opinion, although the trial court allowed the plaintiff to inquire into Bazos' working relationship with Rodin, such inquiry was not sufficient and did not allow the plaintiff to impeach the credibility of Bazos. Furthermore, the trial court could have cured any possible prejudice to the defendants created by the introduc-

tion of evidence that Bazos was involved in other litigation on behalf of Rodin by instructing the jury regarding the limited purpose of impeachment evidence and not allowing any inquiry into the details of those other cases.

Third, the particular evidence of the allegedly misleading and inconsistent testimony by Bazos was not cumulative of any other evidence at trial. Indeed, the defendants were allowed to introduce Bazos as an expert, discuss his qualifications and offer his testimony as an expert. The plaintiff was not allowed to impeach his credibility and show that Bazos may have offered misleading and inconsistent testimony during the course of the litigation.

My review of the entire record in the present case, in light of these considerations, compels the conclusion that there is no fair assurance that the evidentiary impropriety did not affect the jury's verdict because the improperly excluded testimony was essential to weighing the testimony of the defendants' only expert witness who was testifying regarding the central issue in this case—whether the defendants breached the standard of care. Moreover, the exclusion of this evidence was not wholly cumulative of other testimony or evidence. Accordingly, I would conclude that the trial court's decision to preclude the plaintiff from cross-examining Bazos with regard to his potentially misleading and inconsistent testimony harmed the plaintiff and that, therefore, the plaintiff is entitled to a new trial.

[1] As noted by the majority, all claims against Saint Mary's Hospital were withdrawn before trial. See footnote 2 of the majority opinion. For the sake of simplicity, I refer to Rodin and Waterbury Orthopaedic Associates, P.C., collectively as the defendants. Where necessary, I refer to these parties individually by name.

[2] I also note that, although Linda Filippelli was originally a plaintiff in the underlying action, she withdrew her claims prior to trial. See footnote 1 of the majority opinion. For the sake of simplicity, all references to the plaintiff in this opinion are to Philip Filippelli III.

[3] The plaintiff also claims that the trial court improperly refused to allow him to make an offer of proof regarding Bazos' misleading and inconsistent testimony. I note that a trial court always should allow a party to make an offer of proof in order to preserve a claim for appellate review. I do not reach the plaintiff's claim regarding the offer of proof, however, because I would conclude that the trial court improperly precluded the plaintiff from offering evidence regarding Bazos' allegedly misleading and inconsistent testimony and remand the matter for a new trial.

[4] Because I would remand the case for a new trial, I do not address the other evidentiary claims relating to the use of the academic journal article, which the plaintiff raised on appeal.

[5] I agree with the facts and procedural history as set forth in the majority opinion and, therefore, include only those additional facts that are relevant to my analysis.

[6] I note that a trial judge should always allow counsel to mark a document for identification purposes in order to preserve any appellate claims with an appropriate record.

[7] Specifically, the following colloquy between the plaintiff's counsel and Bazos occurred during Bazos' deposition:

"Q. . . . How many medical malpractice cases would you say you've given testimony in?

"A. Maybe three or four.

"Q. Over what period of time?

"A. Probably the past six years.

"Q. Do you know the names of any of the parties that you have given deposition testimony on behalf of? In other words, I take it you were disclosed as an expert on behalf of a physician, correct?

"A. Yes.

"Q. Do you remember the names of any of the physicians for which you have given deposition testimony as a disclosed expert on their behalf?

"A. The only one I remember, because it was relatively recent, was . . . Geiger . . . .

\* \* \*

"Q. The other two, maybe three cases in which you have given deposition testimony as an expert; who have you worked with on those cases? What firm; do you know?

"A. I believe with [counsel for the defendants] . . . .

\* \* \*

"Q. Do you know . . . Rodin?

"A. No.

\* \* \*

"Q. Had you ever heard of . . . Rodin before being involved in this case? You said you hadn't worked with him before.

"A. I've seen his name; I've not worked with him, but Waterbury is not that far away, and we'll occasionally see patients that live there and may have been treated out there in the past."

[8] The defendants assert that the alleged false testimony was "clarified in his errata sheet." The errata sheet referred to by the defendants was completed on May 9, 2011, approximately three days after the trial court heard argument on the motions in limine in this matter and determined that the plaintiff would not be allowed to introduce any evidence of other medical malpractice actions in which Rodin was named as a defendant. In his errata sheet, Bazos testified: "I have never met . . . Rodin but [the defendants' counsel] retained me as an expert witness in two other cases for . . . Rodin." The existence of the errata sheet, however, did not preclude the plaintiff's right to cross-examine Bazos. The defendants would have been free to offer the errata sheet during his direct examination of Bazos and explore it during his redirect testimony.

[9] At trial, the following colloquy occurred:

"[The Plaintiff's Counsel]: And it's true . . . isn't it, that you've had an ongoing working relationship with . . . Rodin since about 2008 . . . ?

"[Bazos]: Yes.

"[The Plaintiff's Counsel]: And, in fact, you've been working with him on several independent matters since that time, correct?

"[Bazos]: No, I've not worked with him, I've worked . . . indirectly with him through another person.

"[The Plaintiff's Counsel]: So you have not had a working relationship with him—

"[Bazos]: On—

"[The Plaintiff's Counsel]: —since 2008?

"[Bazos]: I have. It depends how you define working relationship?

"[The Plaintiff's Counsel]: And that—one—actually, one of those relationships continues, presently; isn't that right?

"[Bazos]: Yes.

"[The Plaintiff's Counsel]: So at least since 2008 you've had had a working relationship with him, correct?

"[Bazos]: Yes.

"[The Plaintiff's Counsel]: Now, do you remember being asked at your deposition, which was taken just about a month ago on April 4, 2011, as to whether you've ever heard of . . . Rodin?

"[Bazos]: I'd have to see the—how you asked it. I think you asked me if I knew him.

"[The Plaintiff's Counsel]: Okay. Did you recall testifying that you had not worked with him?

"[Bazos]: I'd have to see it. I don't have an independent recall, no.

"[The Plaintiff's Counsel]: You don't have an independent recall?

"[The Plaintiff's Counsel]: No. . . .

"[The Plaintiff's Counsel]: Can I have the . . . deposition transcript. Exhibit 23 for [identification], Your Honor.

"The Court: Thank you.

"[Bazos]: Thank you.

"[The Plaintiff's Counsel]: I'm going to direct your attention to page 142, line 20.

"[Bazos]: I have it.

"[The Plaintiff's Counsel]: The question was, had you ever heard of . . . Rodin before being involved in this case? You said, you hadn't worked with him before. And what was your answer?

"[Bazos]: I'm reading from my deposition. I've seen his name, I've not worked with him, but Waterbury is not that far away and will occasionally see patients that live there and may have been treated out there in the past.

"[The Plaintiff's Counsel]: So this deposition that you gave was on April

4, 2011, just a little over a month ago, correct . . .?

"[Bazos]: That's correct, yes.

"[The Plaintiff's Counsel]: And you had seen his name before that deposition, correct?

"[Bazos]: That's what I said. I said—I just read—I'll read it again. I said, I've seen his name.

"[The Plaintiff's Counsel]: Right. You had a working relationship that dated back to 2008 and this deposition was given on April 4, 2011; isn't that right?

"[Bazos]: I met . . . Rodin yesterday for the first time in my life.

"[The Plaintiff's Counsel]: So your testimony [is that] you did not have a working relationship with him or that you did?

"[Bazos]: I just said earlier that I did have a working relationship. I met him yesterday for the first time.

"[The Plaintiff's Counsel]: And according to the answer that you gave at your deposition you made it appear as though you may have come across his name by—in one of your patient's records; isn't that the gist of your testimony?

"[Bazos]: No. Apparently, that's your interpretation. Maybe I should just read it again. I said, I've seen—

"[The Plaintiff's Counsel]: Yes, why don't you read it again.

"[Bazos]: I've seen his name, I've not worked with him, but Waterbury is not that far away and will occasionally see patients that live there and may have been treated out there in the past.

"[The Plaintiff's Counsel]: So you have a working relationship with him that began in 2008, but you have not worked with him; is that your testimony?

"[Bazos]: Yeah. I met him yesterday for the first time.

"[The Plaintiff's Counsel]: Okay. But you've had a working relationship with him that dates back to 2008—

"[The Defendants' Counsel]: Objection, Your Honor. Asked and answered.

"[The Plaintiff's Counsel]: —isn't that right . . . ?

"[The Defendants' Counsel]: —like, four or five times now. Can we have a sidebar, please?

"The Court: Yes."

———————————————